[Civ. No. 22196. Third Dist. May 22, 1984.]

CITY OF SACRAMENTO, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

COUNTY OF LOS ANGELES, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

COUNSEL

George Deukmejian and John K. Van de Kamp, Attorneys General, Richard D. Martland and N. Eugene Hill, Assistant Attorneys General, and Jeffrey J. Fuller, Deputy Attorney General, for Defendants and Appellants.

James P. Jackson, City Attorney, and William P. Carnazzo, Deputy City Attorney, for Plaintiffs and Respondents.

Steven R. Meyers, City Attorney (San Leandro), and Elizabeth Hassard Silver, Assistant City Attorney, as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

CARR, J.—The question tendered by this appeal is whether costs incurred by local governments in complying with the provisions of chapter 2, Statutes 1978 (Chapter 2), which required public employees be covered by the state unemployment insurance law, are "'costs mandated by the state'" for which reimbursement is required by Constitution (Cal. Const., art. XIII B, § 6) and statute. (Rev. & Tax. Code, § 2231, subd. (a).) We answer this question in the affirmative, as did the trial court, and accordingly, shall affirm.

### BACKGROUND

Plaintiffs City of Sacramento and County of Los Angeles filed individual claims with the State Board of Control (Board) seeking reimbursement for the costs of providing unemployment insurance to their employees as required by Chapter 2. The Board, after a hearing, denied these claims, holding that Chapter 2 was an enactment required by federal law, not a "state mandate" subject to reimbursement. Pursuant to Revenue and Taxation Code section 2253.5,[1] the plaintiffs sought relief in the Sacramento County Superior Court, where the actions were consolidated for hearing. The trial court found Chapter 2 was a state-mandated local program, granted the petition for writ of mandate and directed the Board to hold another hearing to determine the amount of plaintiffs' claims. To better understand the contentions on this appeal, we journey back to the beginnings of unemployment compensation law and trace the developments which led to the present controversy.

---

[1] Revenue and Taxation Code section 2253.5 provides: "A claimant or the state may commence a proceeding in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure to set aside a decision of the Board of Control on the grounds that the board's decision is not supported by substantial evidence. The court may order the board to hold another hearing regarding such claim and may direct the board on what basis the claim is to receive a rehearing."

During the great depression, the ranks of unemployed persons rose to unprecedented heights. The individual states were reluctant to provide comprehensive assistance, however, for fear of placing themselves in a position of economic disadvantage as compared with their neighbors. (*Steward Machine Co.* v. *Davis* (1937) 301 U.S. 548, 588 [81 L.Ed. 1279, 1291, 57 S.Ct. 883, 109 A.L.R. 1293].) The result was the Social Security Act of 1935, the initial federal unemployment compensation program. The current version of that program is the Federal Unemployment Tax Act. (26 U.S.C. § 3301 et seq.) The federal act imposes a tax upon private employers (who meet certain minimum standards) equal to 3.5 percent of the total wages paid during the calendar year. (26 U.S.C. §§ 3301(1), 3306(a).) Government employers are exempt from the tax. (26 U.S.C. § 3306(c)(7).) Just as the 1935 act, the present law provides an inducement to states to provide their own unemployment insurance programs. (See *Gillum* v. *Johnson* (1936) 7 Cal.2d 744, 754 [62 P.2d 1037, 108 A.L.R. 595].) Employers in states which have an unemployment compensation law which meets certain standards (26 U.S.C. §§ 3303, 3304), are eligible for a credit based on taxes paid to the state unemployment insurance system of up to 2.7 percent of the 3.5 percent federal tax. (26 U.S.C. § 3302(B).)

Prior to 1976, inclusion of public employees in the state unemployment insurance system was not a condition for certification of the state law and receipt of the tax credit. In that year, however, Congress enacted Public Law No. 94-566, which amended the Federal Unemployment Tax Act to make inclusion of public employees a prerequisite of certification. (Pub.L. No. 94-566 (Oct. 20, 1976) § 115(a), 90 Stat. 2667; 26 U.S.C. §§ 3304(a)(6)(A), 3309(a)(1)(B).) Public employers remained exempt from the federal tax following the enactment of Public Law No. 94-566, but those states which did not include public employees in their unemployment insurance law were subject to the risk of losing the tax credit which benefitted the private employers in the state.

California quickly responded to Public Law No. 94-566 and the Legislature enacted Chapter 2 as an urgency measure, effective January 30, 1978. (Stats. 1978, ch. 2, § 108, p. 52.) The effect of Chapter 2 was to require all local governmental employers, including plaintiffs, to pay into the state unemployment insurance system on behalf of their public employees. (Stats. 1978, ch. 2, §§ 24, 31, 36, 36.5.) In making this change the Legislature stated: "Unless California enacts this act to be operative not later than January 1, 1978, California's unemployment insurance program will be out of conformity with the mandates of federal law under Public Law 94-566. This would seriously disrupt California's economy by the imposition of burdensome federal taxes on California employers and imperil the payment of unemployment benefits by the denial of federal funds to pay for the administration of the payment of such benefits to unemployed claimants in

California. In order to preserve California's unemployment insurance system and assure uninterrupted payment of unemployment benefits in the interest of the public peace, health, or safety, it is necessary that this act take effect immediately." (Stats. 1978, ch. 2, § 108, p. 52.)

The question of reimbursement had its genesis in the "Property Tax Relief Act of 1972." (Stats. 1972, ch. 1406, § 1, p. 2931.) That act, generally known as "SB 90," provided for a system of limitations on local governments' power to levy property taxes, with the concomitant requirement of reimbursement to such local governments for costs mandated upon them by the state in the form of increased levels of services or programs. The "SB 90" process is currently embodied in Revenue and Taxation Code section 2201 et seq. (See Stats. 1973, ch. 358, § 3, p. 779.) Revenue and Taxation Code section 2231, subdivision (a) provides in part: "The state shall reimburse each local agency for all 'costs mandated by the state', as defined in section 2207." That section states: "'Costs mandated by the state' means any increased costs which a local agency is required to incur as a result of . . . : [¶] (a) Any law enacted after January 1, 1973, which mandates a new program or an increased level of service of an existing program; . . ." (Rev. & Tax. Code, § 2207, subd. (a).) "Costs mandated by the federal government," on the other hand, are not subject to reimbursement, and local governments are permitted to levy taxes in addition to the maximum property tax rate to pay such costs. (Rev. & Tax. Code, § 2271.)

On November 6, 1979, California voters determined to make a limitation—reimbursement system similar to "SB 90" a part of the Constitution. By initiative measure at the special statewide election on that date, the voters enacted Proposition 4, thereby adding article XIII B to the California Constitution (hereafter referred to as article XIII B). The so-called "Spirit of 13" initiative provided for limitations on the ability of all California governmental entities to appropriate funds for expenditures. (Cal. Const., art. XIII B, §§ 1, 8, subds. (a), (b).) As relief to local governments, section 6 of article XIII B provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

Faced with the ballooning problem of reimbursing local governments for the cost of all state-mandated programs, the Legislature devised two paper

solutions. First, "[s]oon after the enactment of SB 90 in 1972, the Legislature began to insert 'disclaimers' into bills which mandated costs on local government. Generally a disclaimer states that the sections of the Revenue and Taxation Code requiring reimbursement are not applicable to the bill for a specified reason." (Legislative Analyst, State Reimbursement of Mandated Local Costs: A Review of the Implementation of Chapter 1135, Statutes of 1977 (Feb. 1980) p. 23; hereafter referred to as the Legislative Analyst's 1980 Report.)[2] Such legislative disclaimers appeared in Chapter 2. In sections 106 and 107 of that act, the Legislature provided "[t]his act is necessary to implement Public Law 94-566, which is hereby deemed to be a 'federal mandate' within the meaning of Sections 2206 and 2271 of the Revenue and Taxation Code" (Stats. 1978, ch. 2, § 106, p. 51); and "[t]here are no state-mandated local costs in this act that require reimbursement under Section 2231 of the Revenue and Taxation Code because this act merely affirms for the state that which has been declared existing law through action by the federal government." (Stats. 1978, ch. 2, § 107, p. 51.)

Following enactment of article XIII B, the Legislature enacted a second method of avoiding reimbursement of costs incurred by local government as a result of state mandates. This method was to expand the definition of nonreimbursable "'costs mandated by the federal government'" as contained in Revenue and Taxation Code section 2206, to include "costs resulting from enactment of a state law or regulation where failure to enact such law or regulation to meet specific federal program or service requirements would result in substantial monetary penalties or loss of funds to public or private persons in the state." (See Stats. 1980, ch. 1256, § 3, p. 4247.) With this statutory background, we now frame the issues on appeal.

## ISSUES

The State of California (State) contends the trial court erred in two respects in granting the instant writ. First, given that Chapter 2 was enacted *prior* to the adoption of article XIII B, the trial court erred in finding that reimbursement of costs the plaintiffs incurred through compliance with Chapter 2 is constitutionally compelled by article XIII B. Second, reimbursement is not required as Chapter 2 relates to federally mandated, not state-mandated, costs. Neither contention has merit.

## STANDARD OF REVIEW

The trial court reviewed the action of the Board pursuant to Revenue and Taxation Code section 2253.5, which provides the rules of administra-

---

[2]This report was judicially noticed by this court on January 3, 1983, pursuant to the State's motion. (Evid. Code, § 452, subd. (c); Cal. Rules of Court, rule 23(b).)

tive mandamus (Code Civ. Proc., § 1094.5) are applicable to the trial court's review. " 'Our role as a Court of Appeal reviewing the action of the superior court in such a case is akin to the Supreme Court's role in reviewing decisions of Courts of Appeal. Where, as here, the superior court . . . conducts in effect an appellate review of [the State Board of Control's] proceedings, and does not itself take evidence or make independent factual determinations, it rules on a pure question of law, which it is in no better position to do than a Court of Appeal. Hence the scope of our review of the [Board's] decision is coextensive with that of the superior court.'' (*Wilson* v. *State Personnel Bd.* (1976) 58 Cal.App.3d 865, 870 [130 Cal.Rptr. 292].)

DISCUSSION

I

The State's challenge to the trial court's finding section 6 of article XIII B is applicable to Chapter 2[3] is two-fold: (1) the intent of the electorate in adopting article XIII B, section 6 was to except from its reach all state laws enacted prior to its effective date, July 1, 1980 (Cal. Const., art. XIII B, § 10); and (2) if the electorate did intend to include within the reach of article XIII B, section 6 enactments passed prior to its effective date, this is an impermissible retroactive application.

These assertions emanate from the language of section 6 of article XIII B which states reimbursement is required for any "new program or higher level of service" mandated by the state, *except* that the Legislature *"May, but need not,"* provide reimbursement for "[l]egislative mandates enacted prior to January 1, 1975. . . ." (Cal. Const., art. XIII B, § 6, subd. (c).) Unquestionably, and this is uncontested, article XIII B, section 6 applies to state mandates enacted after its effective date (July 1, 1980). Pursuant to subdivision (c), reimbursement is *not* required for mandates prior to January 1, 1975, although the Legislature may choose to reimburse such mandates. This exception leaves a "window" period extending from January 1, 1975 to July 1, 1980, in which the applicability of article XIII B, section 6 is uncertain. Chapter 2 falls within this window period.

In support of its contention that section 6 does not specifically require reimbursement for mandates enacted between January 1, 1975, and the effective date of article XIII B but that those reimbursements remain permissive, the State relies on a statement by the legislative analyst in the ballot

---

[3]We note this issue was not decided by the Board since its decisions denying reimbursement were entered April 18, 1979, prior to the adoption of article XIII B.

pamphlet for the November 6, 1979, special statewide election. That statement reads: "The initiative specifies that the Legislature need not provide such reimbursements for mandates enacted or adopted *prior* to January 1, 1975, but does not require explicitly that reimbursement be provided for mandates enacted or adopted after that date. Legislative Counsel advises us that under this measure the state would only be *required* to provide reimbursements for costs incurred as a result of mandates enacted or adopted *after* July 1, 1980." (Legislative Analyst's 1980 Report, *supra*, p. 21.) (Original italics.)

■ The ballot summary, arguments and analysis presented to the electorate in connection with a particular initiative may be looked to in trying to ascertain the probable meaning of uncertain language (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281]), but " '[s]uch aids to the interpretation of a written document while available to the courts are not at all to be considered as controlling, since whatever may have been the intent of the proponents of a particular change in a law must at the last analysis be derived from the language of the proposed enactment purporting to effect such change.' " (*Cal. Inst. of Technology* v. *Johnson* (1942) 55 Cal.App.2d 856, 859 [132 P.2d 61], citing *Fay* v. *District Court of Appeal* (1927) 200 Cal. 522, 537 [254 P. 896].) ■ The basic flaw in crediting the legislative counsel's opinion as indicative of the voters' intent in enacting article XIII B, section 6, is that it violates a basic tenet of statutory construction;[4] it would render subdivision (c) of article XIII B, section 6 meaningless. If the voters intended to make *all* state mandates prior to July 1, 1980, subject to *permissive* reimbursement, it would be superfluous to tie the permissive reimbursement exception specifically to the date of January 1, 1975. We reject the conclusion that the electorate intended subdivision (c) to be devoid of meaning (*In re Marriage of Havens* (1981) 125 Cal.App.3d 1012, 1016 [178 Cal.Rptr. 477]), and construe article XIII B section 6, if possible, to give significance to every word, phrase, sentence and part thereof. (*Turner* v. *Board of Trustees* (1976) 16 Cal.3d 818, 826 [129 Cal.Rptr. 443, 548 P.2d 1115].)

The most reasonable meaning of the permissive reimbursement exception contained in subdivision (c) of article XIII B, section 6 is that the Legislature *may* reimburse mandates enacted prior to January 1, 1975, and *must* reimburse mandates passed after that date, but does not have to begin such reimbursement until the effective date of article XIII B (July 1, 1980). This

---

[4]Generally speaking, principles of construction applicable to statutes are also applicable to constitutional provisions. (*Hammond* v. *McDonald* (1942) 49 Cal.App.2d 671, 681 [122 P.2d 332], disapproved on another point in *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125, 134 [173 P.2d 545].)

construction accords with the rule of *expressio unius est exclusio alterius*: where the electorate has specified an exception to the general rule of mandatory reimbursement (mandates prior to Jan. 1, 1975), other exceptions are not to be implied or presumed. (See *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].) This construction was reached in a published opinion of the Attorney General, rendered prior to the inception of this litigation. Responding to a state senator's request for an opinion on whether the costs of a program requiring judicial arbitration in municipal courts was reimbursable pursuant to article XIII B, section 6, the Attorney General noted that the 1978 legislation imposed these costs on the counties. (64 Ops.Cal.Atty.Gen. 261, 262 (1981).) As the relevant legislation fell into the "window" period in article XIII B, section 6, subdivision (c), the opinion noted "that Article XIII B, section 6, subdivision (c) sets forth a January 1, 1975 cut-off date for certain purposes. Legislative mandates or implementing executive orders or regulation in effect prior to that date may, but need not be, funded by the Legislature. Although Article XIII B, section 6 says nothing specifically with respect to 'mandates' between January 1, 1975 and the effective date of Article XIII B, that is, July 1, 1980 (see Cal. Const., Art. XIII B, § 10), *we conclude that the only logical inference to be drawn therefrom is that such 'mandates' are to be included within the scope of Article XIII B.*" (64 Ops.Cal.Atty.Gen. at p. 263 (1981).) (Italics added.) The Attorney General is now in the position of having to argue to this court that his prior opinion was wrong and should be disregarded. We disagree and conclude the prior opinion of the Attorney General, unbiased by the obligation of representing a particular viewpoint, is most persuasive.

Moreover, any persuasiveness of the legislative counsel's opinion in the ballot pamphlet, upon which the Attorney General *now* relies, is undercut by a showing it was based on faulty reasoning. The Legislative Analyst's 1980 Report contains a detailed discussion of how legislative counsel reached its opinion. The reasoning was that if local governments paid for state mandates enacted during the 1975 to 1980 window period, these costs would be included in the local government's "appropriations subject to limitation" on the effective date of article XIII B. (Cal. Const., art. XIII B, §§ 1, 10.) If article XIII B was construed to require reimbursement of such mandates for costs incurred after its effective date, however, the cost burden would shift to the State, whose "appropriations subject to limitation" from the preceding year would not reflect these local costs with the result that after July 1, 1980, the State would be forced to pay increased costs without an increase in its appropriations limit but the local entity would have the benefit of an expenditures decrease without any reduction in its appropriations limit. (Legis. Analyst's 1980 Report, p. 94.) The flaw in this reasoning was noted by the legislative analyst. To the extent the State mandated

costs between 1975 and 1980 and did not fund these mandates, when reimbursement became required in 1980 the appropriations limit for both entities could be adjusted by shifting the cost from the local entity to the state pursuant to the transfer section of section 3, subdivision (c), article XIII B.[5] The State then suffers no detriment and the local entities receive no windfall benefit.

What reliance, if any, was placed by the voters on the brief opinion of Legislative Counsel as related in the ballot pamphlet is speculative. Significantly, however, the legislative analyst did *not* adopt Legislative Counsel's opinion as authoritative, stating instead, "Legislative Counsel *advises us*" that no reimbursement would be required for mandates enacted during the window period. (Legislative Analyst's 1980 Report, *supra,* p. 21.) (Italics added.) For these reasons, we conclude the ballot pamphlet does not provide authoritative guidance to the meaning of subdivision (c) of article XIII B, section 6.

Turning to the language of the provision itself (*Cal. Inst. of Technology* v. *Johnson, supra,* 55 Cal.App.2d at p. 859), we discern no reason for the inclusion of the January 1, 1975, date other than to require reimbursement prospectively after the effective date of the article for mandates between July 1, 1975, and the effective date of July 1, 1980. This construction is the logical and reasonable inference from the apparent window period in subdivision (c) and comports with established rules of statutory construction.

The State further contends that application of article XIII B, section 6 to mandates enacted prior to its effective date constitutes an impermissible retroactive operation. The State's argument fails to recognize that an enactment may have an "operative" date *different* from its "effective" date. (See *Estate of Nicoletti* (1982) 129 Cal.App.3d 475, 479 [181 Cal.Rptr. 137].) As noted earlier, article XIIIB, section 6 operates on mandates enacted after January 1, 1975, but reimbursement is not required until the effective date of July 1, 1980. This was the precise analysis adopted by the Attorney General in his 1981 opinion. In concluding that mandates enacted between 1975 and 1980 were covered by article XIII B, section 6, the Attorney General stated, "we do not mean to say that Article XIII B is to be *applied*

---

[5]Article XIII B; section 3, subdivision (a) of the California Constitution provides: "The appropriations limit for any fiscal year pursuant to Sec. 1 shall be adjusted as follows: [¶] (a) In the event that the financial responsibility of providing services is transferred, in whole or in part, whether by annexation, incorporation or otherwise, from one entity of government to another, then for the year in which such transfer becomes effective the appropriations limit of the transferee entity shall be increased by such reasonable amount as the said entities shall mutually agree and the appropriations limit of the transferor entity shall be decreased by the same amount."

retroactively, but only that it shall operate *prospectively* after July 1, 1980, its effective date, with respect to mandates both after that date and those in effect between January 1, 1975, and such date. This conclusion is in accord with the usual rule of statutory construction that '[s]tatutes should not be given retroactive application unless it is clearly apparent that the Legislature so intended' (*Bollen* [*sic*] v. *Wood* (1979) 96 Cal.App.3d 944, 957) but that '[a] statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment' (*Sitzman* v. *City Board of Education* (1964) 61 Cal.2d 88, 89.)" (64 Ops.Cal.Atty.Gen. at p. 263 (1981).) We conclude our similar construction of article XIII B, section 6 of the state Constitution does not involve a retroactive operation.

*County of Orange* v. *Flournoy* (1974) 42 Cal.App.3d 908 [117 Cal.Rptr. 224], affords no solace to the State. That case also dealt with interpretation of the amendments to the Property Tax Relief Act of 1972. (*Id.*, at p. 910.) The County of Orange contended the application of reimbursement to state-mandated programs "'enacted after January 1, 1973,'" as contained in Revenue and Taxation Code section 2231, subdivision (a), should be construed to mean programs "'effective after January 1, 1973.'" (*Id.*, at p. 912.) In affirming the denial of the county's writ petition, this court found no ambiguity in the statute. Although the statutes for which the county sought reimbursement were to become effective after January 1, 1973, they were all *enacted* prior to that date. (*Id.*, at p. 911.) Pursuant to the plain meaning of the statute, reimbursement was not required. (*Id.*, at pp. 912-913.) The only relevance of *County of Orange, supra*, to this case is the holding that the effective date of a statute may be different from its date of enactment. In the present case, the constitution requires reimbursement for mandates "enacted" after January 1, 1975. (Cal. Const., art. XIII B, § 6, subd. (c).) The holding of *County of Orange, supra*, is entirely consistent with the concept that such reimbursement does not become "effective" until a later date.

## II

The State next contends that irrespective of whether reimbursement is constitutionally required for state-mandated programs, reimbursement is not required in this case because Chapter 2 is a *federally* mandated program. We disagree.

The State does not contend that Public Law No. 94-566 actually required state and local governmental employers to pay unemployment insurance tax

but urges instead that the provisions of Public Law No. 94-566 were such a strong coercive force toward inclusion of public employees in the state unemployment insurance system that the State's implementing legislation (Stats. 1978, ch. 2) was a de facto federal mandate. The State contends it had no practical alternative but to comply with the requirements of Public Law No. 94-566. If the State had not included public employees in its unemployment insurance system, private employers in the State would have lost their federal tax credit, an amount in excess of one billion dollars. As this alternative was politically unthinkable, the Legislature had no choice but to enact Chapter 2, thereby complying with the federal mandate.

The issue of the coercive force of Public Law No. 94-566 has twice been addressed and rejected by the federal courts. In *State of New Hampshire* v. *Marshall* (1st Cir. 1980) 616 F.2d 240, the state challenged the constitutionality of Public Law No. 94-566, particularly as it related to the coverage of the employees of a state and its political subdivisions. (*Id.*, at pp. 242-243.) The issue was whether Public Law No. 94-566 was so coercive as to violate the sovereign integrity of the state and impair its ability to function in the federal system as guaranteed by the Tenth Amendment to the United States Constitution. (See *National League of Cities* v. *Usery* (1976) 426 U.S. 833 [49 L.Ed.2d 245, 96 S.Ct. 2465].) In holding there was no Tenth Amendment violation, the court stated "the basic premise and statutory scheme of the federal-state unemployment compensation program, which have remained unchanged since 1935, are based on the concept that a state is free to accept federal conditions by conforming to federal statutory requirements or can refuse to participate entirely." (*New Hampshire, supra,* 616 F.2d at p. 245.) New Hampshire argued, as does the State in this case, that it had no real option of refusing to participate in the federal program because of the severe financial consequences to its private employers. (*Id.*, at p. 246.) The First Circuit was unpersuaded by this argument. "We do not agree that the carrot has become a club because rewards for conforming have increased. It is not the size of the stakes that controls, but the rules of the game." (*Id.*, at p. 246.)

In *County of Los Angeles* v. *Marshall* (D.C.Cir. 1980) 631 F.2d 767, 769, the court followed *New Hampshire* v. *Marshall, supra,* 616 F.2d 240, and held "[t]he voluntary and wholly optional aspect of [the Federal Unemployment Tax Act] persists in full measure under the 1976 amendments, . . ." Both these federal cases rely on the original case upholding the constitutionality of the federal unemployment insurance program. In *Steward Machine Co.* v. *Davis, supra,* 301 U.S. 548 [81 L.Ed. 1279], Justice Cardozo rejected the idea that the "carrot and stick" approach of the federal

system unfairly coerced the states. "The difficulty with the petitioner's contention is that it *confuses motive with coercion.* 'Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed.' [Citation.] In like manner every rebate from a tax when conditioned upon conduct is in some measure a temptation. *But to hold that motive or temptation is equivalent to coercion is to plunge the law into endless difficulties."* (*Id.,* at pp. 589-590 [81 L.Ed. at p. 1292].) (Italics added.)

We do not perceive that the State was coerced into enacting Chapter 2. Conceding that refusal to participate in the federal program may not have been *politically* palatable to the Legislature, this does not equate with being *legally* required to participate.[6] Faced with a major financial incentive for its private sector, the State opted to continue its participation in the federal program. The issue then is whether this incentive-induced choice constitutes a "federal mandate" as defined by state law.

■ The 1973 amendments to the Property Tax Relief Act of 1972 (Sen. Bill No. 90) defined "costs mandated by the federal government" as "any increased costs mandated upon a local agency after January 1, 1973, in order to comply with requirements of federal statute or regulation." (Former Rev. & Tax. Code, § 2206; Stats. 1973, ch. 358, p. 780.) Public Law No. 94-566 neither required nor coerced states to do anything. A financially induced choice is not the same as a statutory requirement. Chapter 2 was *not* a federal mandate under the law as it existed in 1978, but a "law enacted after January 1, 1973, which mandates a new program or an increased level of service of an existing program." (Rev. & Tax. Code, § 2207, subd. (a).) Chapter 2 created "costs mandated by the state," and reimbursement was required under Revenue and Taxation Code section 2231, subdivision (a).

■ The legislative disclaimers contained in sections 106 and 107 of Chapter 2 do not compel a different conclusion. They are merely legislative characterizations of that enactment. The interpretation of statutory language is a judicial function. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].) While legislative declarations and characterizations are a factor we may consider in construing legislation, they are not binding. (*County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 675 [114 Cal.Rptr. 345, 522 P.2d 1345]; *Department of General Services* v. *Superior Court* (1978) 85 Cal.App.3d 273, 282 [147 Cal.Rptr. 422].) This is particularly true when the characterization is the product of an at-

---

[6]For example, New Hampshire chose not to conform to the federal standards, thus precipitating the controversy in that case. (*State of New Hampshire* v. *Marshall, supra,* 616 F.2d at p. 246, fn. 7.)

tempt to avoid the imposition of a financial responsibility. The Legislature's effort to label Chapter 2 a "federal mandate" is unavailing.

Moreover, the legislative characterization in sections 106 and 107 of Chapter 2 runs afoul of the constitutional requirement of reimbursement. The State correctly points out that federal mandates are not encompassed by article XIII B, section 6. The concept of federal mandates, however, is defined in section 9 of article XIII B. Subdivision (b) of that section excludes from a governmental entity's appropriation limit "[a]ppropriations required for purposes of complying with mandates of . . . the federal government which, *without discretion, require* an expenditure" by the governmental entity. (Italics added.) As contemplated by article XIII B, section 9, a federal mandate is one pursuant to which the federal government imposes a cost upon a governmental entity, and the entity has *no discretion* to refuse the cost. Chapter 2 was not a federal mandate within this constitutional definition, as the State had the discretion to participate or not in the federal unemployment insurance system. ■ It is a settled principle of statutory construction that when a word or phrase has been given a particular meaning in one part of a law, it is to be given the same meaning in other parts of the law. (*Diachenko* v. *State of California* (1981) 123 Cal.App.3d 932, 938 [177 Cal.Rptr. 164].) Article XIII B, section 9, subdivision (b) defines a mandate as an enactment which directs compliance "without discretion;" we must therefore assume the voters intended the same meaning for "mandates" enacted by the State in section 6 of article XIII B. The local governments had no discretion whether or not to comply with Chapter 2. (Unemp. Ins. Code, §§ 605, 976.) ■ To the extent that sections 106 and 107 of Chapter 2 attempt to characterize that act as a federally mandated program, such sections conflict with article XIII B, sections 6 and 9 and must yield to the constitutional definition. The trial court's finding to this effect is properly upheld.

The State's final line of defense is an amendment to Revenue and Taxation Code section 2206, enacted in 1980, *after* the effective date of article XIII B. (Stats. 1980, ch. 1256, § 3, p. 4247.) That amendment increased the scope of " '[c]osts mandated by the federal government' " to include: "costs resulting from enactment of a state law or regulation where failure to enact such law or regulation to meet specific federal program or service requirements would result in substantial monetary penalties or loss of funds to public or private persons in the state." (Rev. & Tax. Code, § 2206.) The amendment further provided that " '[c]osts mandated by the federal government' does not include costs which are specifically reimbursed or funded by the federal or state government or programs or services which may be implemented at the option of the state, local agency, or school district." (Rev. & Tax. Code, § 2206.)

The State contends Chapter 2 involves "[c]osts mandated by the federal government" under the amended Revenue and Taxation Code section 2206, as the failure to enact such a statute would have resulted in substantial monetary penalties to the State's private employers. To reach this conclusion the State necessarily urges the 1980 amendment to Revenue and Taxation Code section 2206 should be applied retroactively to Chapter 2. To overcome the presumption against retroactive operation (*Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 686 [91 Cal.Rptr. 585, 478 P.2d 17]), the state relies on a portion of the Legislative Analyst's 1980 Report, in which it is suggested that the definition of federal mandates be expanded to include situations where federal program requirements involve substantial monetary incentives or penalties. (Legis. Analyst's 1980 Report, p. 21.) The report refers to Public Law No. 94-566 and the resulting Chapter 2 as an example of such a situation. (Legis. Analyst's 1980 Report, p. 22.) The State urges this demonstrates the Legislature had Chapter 2 "specifically" in mind when it enacted the 1980 amendment to Revenue and Taxation Code section 2206. ■ We assume the State refers not to the minds of the individual legislators when enacting the statute, which is not determinative of the statutory meaning but to the intention of the Legislature as a collective entity as reflected in the words of the statute (see *In-Home Supportive Services* v. *Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 739 [199 Cal.Rptr. 697]), and that in ascertaining the legislative intent as to the retroactive application of Revenue and Taxation Code section 2206, as amended in 1980, we are asked to look to the Legislative Analyst's 1980 Report as the basis for that 1980 amendment. It is not necessary to employ the report as an intrinsic aid to interpreting the statute as the statutory language is clear and unambiguous. There is simply no language in section 2206 that the statute is to be retroactive in operation. Even considering the report as urged by the State, we find it equally likely that the Legislature intended to prevent reimbursement problems such as those presented by Public Law No. 94-566 on a prospective basis only.

Moreover, had such an intent been express, *any* application of the amended version of Revenue and Taxation Code section 2206 to federal laws which merely provide financial incentives for compliance would conflict with the definition of a federal mandate contained in article XIII B, section 9, subdivision (b). That subdivision defines a federal mandate as one leaving the state or local government *no discretion* as to alternatives. If participation in a federal program is optional, it follows that state legislation requiring local participation involves a *state* mandate under article XIII B, section 6. ■ Revenue and Taxation Code section 2206 insofar as it defines as nonreimbursable federal mandates those federal programs which make state participation optional, even if substantial financial incentives indicate the desirability of participation, is invalid under article XIII B, section 6 and

9.[7] Revenue and Taxation Code section 2206 as amended did not convert Chapter 2 into a nonreimbursable federal mandate.

CONCLUSION

The State has attempted to avoid the inevitable financial consequences of following political motivations by characterizing those motives as a legal necessity. As Justice Cardozo noted, the State "confuses motive with coercion." (*Steward Machine Co.* v. *Davis, supra,* 301 U.S. at p. 589 [81 L.Ed. at p. 1292].) The Board was wrong as a matter of law in finding Chapter 2 was not a state mandate. The trial court properly rebuffed the State's efforts to uphold this erroneous decision and correctly ordered a peremptory writ of mandate compelling a new hearing of plaintiffs' claims on the basis that Chapter 2 constitutes a state-mandated local program.

The judgment is affirmed.

Regan, Acting P. J., and Blease, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 19, 1984.

---

[7]As well as being constitutionally infirm, Revenue and Taxation Code section 2206 is internally inconsistent. While purporting to include as "costs mandated by the federal government" federal programs which invite state participation by financial incentives, it excludes from federal mandates those "programs or services which may be implemented at the *option* of the state, . . ." (Rev. & Tax. Code, § 2206.) (Italics added.) The very concept of a financial incentive is to attract participation by one who is not bound to participate; i.e., by one whose participation is *optional.*