122 Cal.Rptr.2d 447 (2002)
100 Cal.App.4th 243
DEPARTMENT OF FINANCE, Plaintiff and Appellant,
v.
COMMISSION ON STATE MANDATES, Defendant and Respondent.
Kern High School District et al., Real Parties in Interest and Respondents.
No. C037645.
Court of Appeal, Third District.
July 17, 2002.
Review Granted October 2, 2002.
*448 Bill Lockyer, Attorney General, Manuel M. Medeiros, Senior Assistant Attorney *449 General, Andrea Lynn Hoch, Louis R. Mauro and Leslie R. Lopez, Deputy Attorneys General, for Plaintiff and Appellant.
Camille Shelton, Sacramento, for Defendant and Respondent.
Jo Anne Sawyerknoll, Sacramento, and Jose A. Gonzales, San Diego, for Real Party in Interest and Respondent San Diego Unified School District.
No appearance by Real Parties in Interest and Respondents Kern High School District and County of Santa Clara.
DAVIS, Acting P.J.
The question in this appeal is whether two state statutesrequiring local school site councils and advisory committees for certain educational programs to prepare and post an agenda for their meetings and to provide for public comment on agenda itemsconstitute a reimbursable state mandate under article XIII B, section 6 of California's Constitution. We agree with the trial court that these statutes specify a "higher level of service" under state mandate principles.[1] We also agree with the trial court that a state mandate is not limited to situations of legal compulsion. We construe state mandate as also extending to situations where the local governmental entity has no reasonable alternative to the state scheme, or has no true choice but to participate in it. The Commission on State Mandates (the Commission) did not consider these issues. We will therefore remand this matter to the Commission for it to determine whether the test claimants have a reasonable alternative or a true choice not to participate in the educational programs at issue, and thus a reasonable alternative to paying the higher costs associated with the higher level of service specified in the two challenged statutes. In light of this remand, we will reverse the trial court's judgment that upheld the Commission's decision finding a state mandate.

BACKGROUND
In 1978, California voters adopted Proposition 13, which added article XIII A (Article XIII A) to the state Constitution. This measure limits the power of state and local governments to tax.[2] In 1979, the state voters added article XIII B to the Constitution (Article XIII B). This measure limits the power of state and local governments to spend.[3]' These two constitutional measures work in tandem; their goal is to protect California residents from excessive government taxation and spending.[4]
Article XIII B includes section 6 (section 6 or Article XIII B, section 6), which sets forth the concept of reimbursable state mandates. With certain exceptions not relevant here, section 6 provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government ["local government" includes school districts], the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service...."[5] "Section 6 recognizes that articles XIII A and XIII B severely restrict the taxing and spending *450 powers of local governments. [Citation.] Its purpose is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are `ill equipped' to assume increased financial responsibilities" in light of Articles XIII A and XIII B.[6]
A reimbursable state mandate does not equate to any "additional cost" that a state law may require a local government to bear.[7] The reimbursable mandate arises only when the state imposes on a local government a new program of governmental services or an increased level of service under an existing program.[8]
In the Government Code, the Legislature has set forth the procedure for determining whether a state law imposes state-mandated costs on a school district or other local agency under Article XIII B, section 6.[9] Pursuant to that procedure, two school districts (San Diego Unified and Kern High) and one county (Santa Clara) filed a "test claim" with the Commission.[10] Kern High and Santa Clara did not appear in the trial court proceedings, and we will refer to the test claimants as such or simply as San Diego Unified.
The test claim concerned two statutes: Government Code section 54952, as amended by Statutes 1993, chapter 1138 (this measure operated from April 1, 1994 to July 21, 1994, for the school site councils and advisory committees at issue here); and Education Code section 35147, as added by Statutes 1994, chapter 239, as an urgency measure (effective from July 21, 1994, onward, for those councils and committees). These two statutes will be referred to as the Test Claim statutes or the two Test Claim statutes.
The 1993 amendment to Government Code section 54952 redefined the "legislative body" that must comply with the open meeting requirements of the Ralph M. Brown Act (the Brown Act),[11] including the requirement imposed by Government Code section 54954.2 to prepare and post an agenda. As amended by the 1993 legislation, section 54952 provides in relevant part:
"As used in this chapter, `legislative body' means:
"(a) The governing body of a local agency or any other local body created by state or federal statute.
"(b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body...."
Education Code section 35147 requires nine designated school site councils and advisory committees to comply with certain notice, agenda, and public comment requirements, but otherwise exempts them *451 from the Brown Act and other open meeting acts. Section 35147 specifies in relevant part:
"(a) Except as specified in this section, any meeting of the councils or committees specified in subdivision (b) is exempt from the provisions of this article, the Bagley-Keene Open Meeting Act ..., and the Ralph M. Brown Act....
"(b) The councils and schoolsite advisory committees established pursuant to [Education Code] Sections 52012, 52065, 52176, and 52852, subdivision (b) of Section 54425, Sections 54444.2, 54724, and 62002.5, and committees formed pursuant to Section 11503 or [former] Section 2604 of Title 25 of the United States Code, are subject to this section.
"(c) Any meeting held by a council or committee specified in subdivision (b) shall be open to the public and any member of the public shall be able to address the council or committee during the meeting on any item within the subject matter jurisdiction of the council or committee. Notice of the meeting shall be posted at the schoolsite, or other appropriate place accessible to the public, at least 72 hours before the time set for the meeting. The notice shall specify the date, time, and location of the meeting and contain an agenda describing each item of business to be discussed or acted upon. The council or committee may not take any action on any item of business unless that item appeared on the posted agenda or unless the council or committee members present, by unanimous vote, find that there is a need to take immediate action and that the need for action came to the attention of the council or committee subsequent to the posting of the agenda. Questions or brief statements made at a meeting by members of the council, committee, or public that do not have a significant effect on pupils or employees in the school or school district or that can be resolved solely by the provision of information need not be described on an agenda as items of business. If a council or committee violates the procedural meeting requirements of this section and upon demand of any person, the council or committee shall reconsider the item at its next meeting, after allowing for public input on the item.
"(d) Any materials provided to a schoolsite council shall be made available to any member of the public who requests the materials pursuant to the California Public Records Act...."
The nine school site councils and advisory committees specified in Education Code section 35147, subdivision (b), were, save for one, established by statutes enacted in the 1970's and 1980's as part of the following programs: the School Improvement Plan (a general program that disburses money across all aspects of school operation and performance; Educ.Code, §§ 52012, 52015); the Native American Indian Education Program (Educ.Code, § 52065); the Chacon-Moscone Bilingual-Bicultural Education Act of 1976 (Educ. Code, §§ 52160, 52176); the School-Based Program Coordination Act (to coordinate various categorical aid programs; Educ. Code, §§ 52850, 52852); the McAteer Act (compensatory education programfor programs beyond regular education program; Educ.Code, §§ 54403, 54425, subd. (b)); the migrant education program (Educ.Code, § 54444.2); the School-Based Pupil Motivation and Maintenance Program and Dropout Recovery Act (to address truancy and dropout issues; Educ. Code, §§ 54720, 54724); the Program[ ] to Encourage Parental Involvement (Educ. Code, § 11503, enacted 1990); and the federal Indian Education Program (see former 25 U.S.C. § 2604; now see 20 U.S.C. § 7801 et seq.).
*452 In the test claim, San Diego Unified alleged that the Test Claim statutes imposed certain open meeting requirements on these school site councils and advisory committees, constituting reimbursable state mandates. The Commission agreed. It found the statutes constituted reimbursable state mandates for the costs of preparing specified meeting agendas, posting those agendas, and providing the opportunity for the public to address agenda items.
Pursuant to Government Code section 17559, the state Department of Finance (the State) brought an administrative mandate proceeding to review the Commission's decision.[12] The trial court agreed with the Commission, stating: "Two primary issues are raised in this matter. The first issue is whether the 1993 amendments to the Brown Act [i.e., to Government Code section 54952] and the 1994 enactment of ... section 35147 mandate a new program or higher level of service. The Court concludes that they do. The second issue is whether a reimbursable state mandate is created only when an advisory council or committee which is subject to the Brown Act is required by state law. The Court concludes that it is not. [¶] The petition for writ of mandate is DENIED."
These are the two issues before us as well. Government Code section 17559 requires that the trial court review the Commission's decision under the substantial evidence standard; where the trial court applies this standard, we are generally confined to inquiring whether substantial evidence supports that court's decision.[13] However, we independently review the trial court's "legal conclusions about the meaning and effect of constitutional and statutory provisions."[14]

DISCUSSION

1. New Program or Higher Level of Service for an Existing Program
A reimbursable state mandate is created only when the state "mandates" a "new program" or a "higher level of service" for an existing program on any local government, including a school district.[15] "Program" has its commonly understood meaning: a program carries out "the governmental function of providing services to the public"; or it is a law "which, to implement a state policy, impose[s] unique requirements on local governments and do[es] not apply generally to all residents and entities in the state." [16]
In this part of the opinion, we address the issue of whether the two Test Claim statutes reflect a "new program" or a "higher level of service" for an existing program. In the next part, we confront the issue of whether the two statutes "mandate" the program services.
The parties spend considerable time on whether the school site councils and advisory bodies were "legislative bodies" subject to the Brown Act before the Test Claim statutes, and thus whether the Test Claim statutes involve a "new program." *453 We need not resolve this matter. Even assuming the school site councils and advisory committees were subject to the Brown Act before the advent of the two Test Claim statutes, these two statutes reflect a "higher level of service" for existing programs.[17]
As a preliminary matter, we note that we are dealing with "programs" within the meaning of the state mandate laws. The provision of educational servicesas carried out by the school site councils and advisory committees at issueis certainly a governmental program, as that term is commonly understood. The two Test Claim statutes, as well, set forth unique requirements on local government (school districts) to further the state policy of open public meetings; these requirements do not apply generally to residents and entities in the state.
On the issue of "higher level of service," the 1993 legislative package that redefined "legislative body" for Brown Act purposes in section 54952 also repealed a Brown Act statute that applied to advisory bodies of local agencies, including advisory bodies of school districts.[18] The repealed Brown Act statute was Government Code section 54952.3; as enacted, it provided in relevant part:
"As used in this chapter `legislative body' also includes any advisory commission, advisory committee or advisory body of a local agency, created by charter, ordinance, resolution, or by any similar formal action of a governing body of a local agency.
"Meetings of such advisory commissions, committees or bodies ... shall be open and public, and notice thereof must be delivered personally or by mail at least 24 hours before the time of such meeting to each person who has requested, in writing, notice of such meeting.
"If the advisory commission, committee or body elects to provide for the holding of regular meetings, it shall provide by bylaws, or by whatever other rule is utilized by that advisory body for the conduct of its business, for the time and place for holding such regular meetings. No other notice of regular meetings is required ...."[19]
The State concedes that all of the school site councils and advisory committees at issue here are advisory bodies. This is borne out by their similar treatment as advisory entities within Education Code section 35147.
The two Test Claim statutes reflect a higher level of service for the existing programs served by these councils and committees than what former Government Code section 54952.3 specified. The Test Claim statutes require that meeting agendas be prepared and posted at least 72 hours before the meeting, and that the public be allowed to address agenda items.[20] These requirements are above *454 those specified in the italicized portions of former Government Code section 54952.3, set forth ante. No party has disputed that the increased amount of costs involving this higher level of service is significant and surpasses the statutory minimum cost mandate set forth in Government Code section 17564.
We conclude that the Test Claim statutes specify a "higher level of service" for existing programs. We now turn to the thornier issue: whether these two statutes "mandate" a higher level of service.

2. "Mandate" a Higher Level of Service
For there to be a reimbursable state mandate here, the Constitution and Government Code require that the Test Claim statutes "mandate" a higher level of service.[21]
The State argues that the school site councils and advisory committees referred to in the Test Claim statutes serve categorical aid programs that school districts participate in either voluntarily or as a condition to receive state or federal funds. From this, the State concludes that, as a matter of law, where a school district participates in a state statutory program voluntarily or conditionally, the State may impose reasonable requirements on the district without providing a reimbursable state mandate, because the State has not legally mandated such program participation. While the State's position looks strong on the surface, there are cracks in its foundation.
The State's position finds support in a 1984 appellate court decision, City of Merced v. State of California.[22] The question there was whether a new state statute that required compensation for business goodwill in local eminent domain proceedings constituted a reimbursable state mandate under statutory law. The court said no, reasoning "that whether a city or county decides to exercise eminent domain is, essentially, an option of the city or county, rather than a mandate of the state. The fundamental concept is that the city or county is not required to exercise eminent domain.... Thus, payment for loss of goodwill is not a state-mandated cost."[23]
Two months after City of Merced, this court, in City of Sacramento v. State of California (Sacramento I),[24] employed similar reasoning. The question in Sacramento I was whether a state law requiring local public employees to be covered by the state unemployment insurance law constituted a state mandate under Article XIII B, section 6, and statutory law.[25] The State asserted that it was only complying with a federal requirement rather than imposing a state mandate.[26] The federal component of the unemployment insurance system induced states to cover local public employees, by making the states incur substantial political and economic *455 detriment for not doing so.[27] We looked at the definition of a federal mandate in Article XIII B, section 9, subdivision (b), which directs compliance "without discretion" or "which unavoidably make[s] the provision of existing services more costly" (costs of federal mandates are not within Article XIII B's spending limits for state and local governments). A federal mandate, we reasoned, is one in which the mandated governmental entity "has no discretion to refuse."[28] We concluded that while it was economically and politically detrimental for the State not to comply with the federal law, the State still had the legal discretion not to do so; however, the local government had no discretion whether to comply with the state statute.[29] Thus, the state statute constituted a reimbursable state mandate.
In 1986, in County of Contra Costa, this court agreed with City of Merced that the state statute requiring the payment of business goodwill in eminent domain proceedings did not constitute a state-mandated cost.[30] We noted that "we employed analogous reasoning in [Sacramento I]."[31] We characterized Sacramento I as follows: "There the city contended that a state law requiring public employees to be covered by the state unemployment insurance law constituted a state mandate. The state countered that it was only complying with a federal requirement.... We noted that federal law provided financial incentives and that it would have been politically unpalatable for the state to refuse to extend coverage to public employees, but nonetheless the decision was optional with the state.... The same reasoning applies here: the decision to proceed in eminent domain is optional with the local government. Since the state does not mandate that the local agency incur the costs it claims, the agency is not entitled to reimbursement from the state."[32]
In 1990, the state Supreme Court, in City of Sacramento v. State of California (Sacramento II),[33] rejected our reasoning in Sacramento I. The issue of state mandate in Sacramento II was the same as in Sacramento I, and again implicated the question of federal mandate.[34]Sacramento II did not directly review Sacramento I, but involved litigation arising from a Sacramento I remand.[35]
As in Sacramento I, the argument in Sacramento II supporting a narrower view of mandate was that the words "without discretion" and "unavoidably" in the Article XIII B, section 9, subdivision (b) definition of federal mandate require that there be clear legal compulsion for there to be a *456 federal mandate.[36] The argument supporting a broader view of mandate countered that the consequences of California's failure to comply with the federal "carrot and stick" scheme were so substantial that the state had no realistic "discretion" to refuse, and thus there was a federal mandate because of practical compulsion.[37]
The Sacramento II court adopted the broader view of mandate, disagreeing with our adoption of the narrower view in Sacramento I. In doing so, the high court noted that the vast bulk of cost-producing federal influence on state and local government is by inducement or incentive rather than by direct legal compulsion.[38] The court noted that "certain regulatory standards imposed by the federal government under `cooperative federalism' [i.e., federal-state carrot and stick] schemes are coercive on the states and localities in every practical sense."[39] The test for determining whether there is a federal mandate, Sacramento II concluded, is whether compliance with federal standards "is a matter of true choice," that is, whether participation in the federal program "is truly voluntary."[40]Sacramento II went on to say: "Given the variety of cooperative federal-state-local programs, we here attempt no final test for `mandatory' versus `optional' compliance with federal law. A determination in each case must depend on such factors as the nature and purpose of the federal program; whether its design suggests an intent to coerce; when state and/or local participation began; the penalties, if any, assessed for withdrawal or refusal to participate or comply; and any other legal and practical consequences of nonparticipation, noncompliance, or withdrawal."[41]
Another state Supreme Court decision that has some bearing on the question of state mandate in terms of legal versus practical compulsion is Lucia Mar[42] The issues there were whether a state statute that required school districts to contribute part of the cost of educating disabled pupils at state schools constituted a "new program" for the districts, and whether the districts were "mandated" by the state to make these contributions.[43] The argument in Lucia Mar that there was no state mandate was that the school districts had the option, under another state statute, to provide a local program for disabled children, to send them to private schools, or to refer them to the state schools.[44] The argument in favor of a state mandate was that the districts "`had no other reasonable alternative than to utilize the services of the state[ ] schools, as they [were] the least expensive alternative in educating [disabled] children.'"[45] Since the Commission in Lucia Mar had concluded that *457 the state statute at issue did not specify a "new program" or "higher level of service," it never reached the issue of state "mandate." The Lucia Mar court concluded there was a "new program," and remanded the mandate issue to the Commission without explicitly resolving whether the concept of state mandate is confined to legal compulsion or whether it extends to practical compulsion as well.[46]
Citing Lucia Mar's mandate discussion, two appellate court decisions have characterized the concept of state mandate in terms of whether the local governmental entity has an alternative to the state scheme. The first decision, County of Los Angeles v. Commission on State Mandates, noted that if "a local entity or school district has alternatives under the statute other than the mandated [cost], it does not constitute a state mandate."[47] Like Lucia Mar, though, County of Los Angeles v. Commission on State Mandates does not say whether these "alternatives," for state mandate purposes, are just legal alternatives or whether they encompass practical alternatives as well. The second decision is a recent decision from this court, City of El Monte.[48] We observed there that "[t]he possible existence of reasonable alternatives ... [leaves] open the question whether the [state-directed cost] [was] mandated...."[49]
In line with Sacramento II's approach to mandate and with this court's characterization of Lucia Mar in City of El Monte, we define the concept of state mandate to include situations where the local governmental entity has no reasonable alternative to the state scheme or no true choice but to participate in it, rather than confine the concept to direct legal compulsion as argued by the State. Our definition aligns with the constitutional and statutory language relating to state mandate when viewed against the backdrop of how the concept of federal mandate in Article XIII B has been interpreted by our Supreme Court. Article XIII B, section 6, as pertinent, states simply that "[whenever the Legislature or any state agency mandates a new program or higher level of service on any local government," the State shall pay for that mandate. Government Code section 17514, part of the statutory scheme that implements Article XIII B, section 6, defines "`[c]osts mandated by the state'" to mean, as relevant here, "any increased costs which a local agency or school district is required to incur ... as a result of any statute ... which mandates a new program or higher level of service of an existing program."[50] Although Article XIII B defines a federal mandate as one being "without discretion" or involving "unavoidabl[e]" costs,[51] our Supreme Court has interpreted that mandate along the lines of whether reasonable, practical alternatives exist to the federal directive.[52] Given the less mandatory language surrounding the definition of state mandate, *458 we construe the Article XIII B concept of state mandate along these same lines. Like the pervasive "carrot and stick" approach to federal-state relations that prompted the federal mandate interpretation, a similar approach pervades state-local relations, as the educational programs referenced in the test claim statute of Education Code section 35147 aptly illustrate.
At oral argument, the State emphasized the statutory language of Government Code section 17513 defining "`[c]osts mandated by the federal government'" as including "costs resulting from enactment of a state law or regulation where failure to enact that law or regulation to meet specific federal program or service requirements would result in substantial monetary penalties or loss of funds to public or private persons in the state." (Italics added.) The State noted that similar language does not appear in the statutory definition of "`[c]osts mandated by the state'" set forth in Government Code section 17514. Nevertheless, as the Sacramento II court observed, Government Code sections 17513 and 17514 merely implement the constitutional language of Article XIII B; the focus of the Sacramento II's "mandate" analysis remained on Article XIII B, section 9's language of "without discretion" and "unavoidabl[e]."[53] In any event, statutory language cannot trump constitutional language nor our high court's interpretation of that constitutional language.
That brings us full circle to the State's argument here. The State argues that, as a matter of law, where a local governmental entity participates in a state statutory program either voluntarily or as a condition of receiving funds, the State may impose reasonable requirements on the entity without having to pay a reimbursable state mandate. The key to this argument is that the concept of voluntary or conditional participation encompasses all participation except that which is legally compelled. Applying this argument, then, the State notes that since San Diego Unified is not legally compelled to offer the programs for which the Test Claim statutes increase the agenda and public comment costs, that is the end of the analysis there can be no state mandate as a matter of law. San Diego Unified may simply discontinue these "discretionary," "voluntary," "optional" programs (i.e., not legally compelled programs) and not incur the additional costs of posting and preparing meeting agendas, and providing for public comment on agenda items, pursuant to the Test Claim statutes.
However, for the reasons set forth above, we do not construe state mandate as limited to situations of legal compulsion. We construe it to also encompass situations where there is no reasonable alternative or no true choice but to participate in the state scheme. The State's narrow view of state mandate ignores the realities of how contemporary multilevel governments carry out much of their business.
The Commission never considered the issues whether the test claimants have a reasonable alternative or a true choice not to participate in the educational programs at issue, and thus a reasonable alternative to paying the higher costs associated with the "higher level of service" specified in Education Code section 35147 and Government Code section 54952. We will remand this matter to the Commission for it to resolve these issues, because the *459 Commission is charged with initially deciding whether a local agency is entitled to reimbursement under Article XIII B, section 6.[54] Furthermore, the statutory procedure to implement Article XIII B, section 6, "establishes procedures ... for the express purpose of avoiding multiple proceedings, judicial and administrative, addressing the same claim that a reimbursable state mandate has been created."[55]

DISPOSITION
The judgment is reversed, and this matter is remanded to the Commission for further proceedings consistent with this opinion. Each party will pay its own appellate costs.
We concur: NICHOLSON and HULL, JJ.
NOTES
[1] California Constitution, article XIII B, section 6; Government Code section 17514.
[2] California Constitution, article XIII A; see County of San Diego v. State of California (1997) 15 Cal.4th 68, 80, 61 Cal.Rptr.2d 134, 931 P.2d 312 (County of San Diego).
[3] See County of San Diego, supra, 15 Cal.4th at page 81,61 Cal.Rptr.2d 134, 931 P.2d 312.
[4] County of San Diego, supra, 15 Cal.4th at page 81, 61 Cal.Rptr.2d 134, 931 P.2d 312.
[5] Article XIII B, section 6; see also Article XIII B, section 8, subdivision (d).
[6] County of San Diego, supra, 15 Cal.4th at page 81, 61 Cal.Rptr.2d 134, 931 P.2d 312.
[7] County of Los Angeles v. State of California (1987) 43 Cal.3d 46, 55-57, 233 Cal.Rptr. 38, 729 P.2d 202 (County of Los Angeles ); City of El Monte v. Commission on State Mandates (2000) 83 Cal.App.4th 266, 277, 99 Cal. Rptr.2d 333 (City of El Monte).
[8] City of El Monte, supra, 83 Cal.App.4th at page 277, 99 Cal.Rptr.2d 333: see Lucia Mar Unified School Dist. v. Honig (1988) 44 Cal.3d 830, 835, 244 Cal.Rptr. 677, 750 P.2d 318 (Lucia Mar); see also County of Los Angeles, supra, 43 Cal.3d at page 56, 233 Cal.Rptr. 38, 729 P.2d 202.
[9] Government Code section 17500 et seq.; Kinlaw v. State of California (1991) 54 Cal.3d 326, 331-333, 285 Cal.Rptr. 66, 814 P.2d 1308 (Kinlaw).
[10] Government Code sections 17521, 17551, subdivision (a).
[11] See Government Code section 54950.5.
[12] Government Code section 17559, subdivision (b).
[13] City of San Jose v. State of California (1996) 45 Cal.App.4th 1802, 1810, 53 Cal. Rptr.2d 521 (City of San Jose).
[14] City of San Jose, supra, 45 Cal.App.4th at page 1810, 53 Cal.Rptr.2d 521.
[15] Article XIII B, sections 6, 8, subdivision (d); Government Code section 17514; Lucia Mar, supra, 44 Cal.3d at page 835, 244 Cal. Rptr. 677, 750 P.2d 318; City of El Monte, supra, 83 Cal.App.4th at page 277, 99 Cal. Rptr.2d 333.
[16] County of Los Angeles, supra, 43 Cal.3d at page 56, 233 Cal.Rptr. 38, 729 P.2d 202.
[17] Article XIII B, section 6; Government Code section 17514; see City of El Monte, supra, 83 Cal.App.4th at page 277, 99 Cal. Rptr.2d 333.
[18] Statutes 1993, chapter 1138, sections 3, 5, pages 6387-6388; see Government Code section 54951.
[19] Former Government Code section 54952.3 (added by Stats. 1968, ch. 1297, § 1, p. 2444 [note: amended nonsubstantively by Stats. 1975, ch. 959, § 7, p. 2241, and by Stats. 1981, ch. 968, § 26, p. 3694]), italics added.
[20] See Government Code section 54954.2, imposing such Brown Act requirements on the advisory bodies at issue here from April 1, 1994 to July 21, 1994; see also Education Code section 35147, imposing such requirements on these advisory bodies from July 21, 1994, onward.
[21] Article XIII B, section 6; Government Code section 17514.
[22] City of Merced v. State of California (1984) 153 Cal.App.3d 777, 200 Cal.Rptr. 642 (City of Merced).
[23] City of Merced, supra, 153 Cal.App.3d at page 783, 200 Cal.Rptr. 642.
[24] City of Sacramento v. State of California (1984) 156 Cal.App.3d 182, 203 Cal.Rptr. 258 (Sacramento I); see also County of Contra Costa v. State of California (1986) 177 Cal. App.3d 62, 79-80, footnote 10, 222 Cal.Rptr. 750 (County of Contra Costa).
[25] Sacramento I, supra, 156 Cal.App.3d at page 186, 203 Cal.Rptr. 258.
[26] Sacramento I, supra, 156 Cal.App.3d at page 186, 203 Cal.Rptr. 258.
[27] Sacramento I, supra, 156 Cal.App.3d at page 187, 203 Cal.Rptr. 258.
[28] Sacramento I, supra, 156 Cal.App.3d at page 197, 203 Cal.Rptr. 258.
[29] Sacramento I, supra, 156 Cal.App.3d at pages 196-197, 203 Cal.Rptr. 258.
[30] County of Contra Costa, supra, 177 Cal. App.3d at pages 79-80 & footnote 10, 222 Cal.Rptr. 750.
[31] County of Contra Costa, supra, 177 Cal. App.3d at page 79, footnote 10, 222 Cal.Rptr. 750.
[32] County of Contra Costa, supra, 177 Cal. App.3d at pages 79-80, footnote 10, 222 Cal. Rptr. 750.
[33] City of Sacramento v. State of California (1990) 50 Cal.3d 51, 266 Cal.Rptr. 139, 785 P.2d 522 (Sacramento II).
[34] Sacramento II, supra, 50 Cal.3d at pages 57, 70, 266 Cal.Rptr. 139, 785 P.2d 522.
[35] Sacramento II, supra, 50 Cal.3d at pages 59-60, 266 Cal.Rptr. 139, 785 P.2d 522; see Hayes v. Commission on State Mandates (1992) 11 Cal.App.4th 1564, 1581, footnote 8, 15 Cal.Rptr.2d 547 (Hayes).
[36] Sacramento II, supra, 50 Cal.3d at page 71, 266 Cal.Rptr. 139, 785 P.2d 522.
[37] Sacramento II, supra, 50 Cal.3d at page 71, 266 Cal.Rptr. 139, 785 P.2d 522.
[38] Sacramento II, supra, 50 Cal.3d at page 73, 266 Cal.Rptr. 139, 785 P.2d 522.
[39] Sacramento II, supra, 50 Cal.3d at pages 73-74, 266 Cal.Rptr. 139, 785 P.2d 522.
[40] Sacramento II, supra, 50 Cal.3d at page 76, 266 Cal.Rptr. 139, 785 P.2d 522; see also Hayes, supra, 11 Cal.App.4th at pages 1581-1582, 15 Cal.Rptr.2d 547.
[41] Sacramento II, supra, 50 Cal.3d at page 76, 266 Cal.Rptr. 139, 785 P.2d 522.
[42] Lucia Mar, supra, 44 Cal.3d 830, 244 Cal. Rptr. 677, 750 P.2d 318.
[43] Lucia Mar, supra, 44 Cal.3d at pages 832, 836, 244 Cal.Rptr. 677, 750 P.2d 318.
[44] Lucia Mar, supra, 44 Cal.3d at page 837, 244 Cal.Rptr. 677, 750 P.2d 318.
[45] Lucia Mar, supra, 44 Cal.3d at page 837, 244 Cal.Rptr. 677, 750 P.2d 318.
[46] Lucia Mar, supra, 44 Cal.3d at pages 836-837, 838, 244 Cal.Rptr. 677, 750 P.2d 318.
[47] County of Los Angeles v. Commission on State Mandates (1995) 32 Cal.App.4th 805, 818, 38 Cal.Rptr.2d 304, citing Lucia Mar, supra, 44 Cal.3d at pages 836-837, 244 Cal. Rptr. 677,750 P.2d 318.
[48] City of El Monte, supra, 83 Cal.App.4th 266, 99 Cal.Rptr.2d 333.
[49] City of El Monte, supra, 83 Cal.App.4th at page 278, footnote 6, 99 Cal.Rptr.2d 333, italics added, citing Lucia Mar, supra, 44 Cal.3d at pages 836-837, 244 Cal.Rptr. 677, 750 P.2d 318.
[50] See Government Code section 17500.
[51] Article XIII B, section 9, subdivision (b).
[52] Sacramento II, supra, 50 Cal.3d at pages 70-76, 266 Cal.Rptr. 139, 785 P.2d 522.
[53] Sacramento II, supra, 50 Cal.3d at pages 70-76, 266 Cal.Rptr. 139, 785 P.2d 522; see Government Code section 17500.
[54] See Lucia Mar, supra, 44 Cal.3d at page 837, 244 Cal.Rptr. 677, 750 P.2d 318; Government Code section 17551; see also Government Code section 17500.
[55] Kinlaw, supra, 54 Cal.3d at page 333, 285 Cal.Rptr. 66, 814 P.2d 1308; see also Government Code section 17500 et seq.