[No. C009519. Third Dist. Dec. 30, 1992.]

THOMAS WILLIAM HAYES, as Director, etc., Plaintiff and Respondent, v.
COMMISSION ON STATE MANDATES, Defendant, Cross-defendant, and Respondent;
DALE S. HOLMES, as Superintendent, etc., Real Party in Interest, Cross-complainant and Appellant;
WILLIAM CIRONE, as Superintendent, etc., Real Party in Interest and Respondent;
STATE OF CALIFORNIA et al., Cross-defendants and Respondents.

**COUNSEL**

Biddle & Hamilton, W. Craig Biddle, Christian M. Keiner and F. Richard Ruderman for Real Party in Interest, Cross-complainant and Appellant.

Breon, O'Donnell, Miller, Brown & Dannis and Emi R. Uyehara as Amici Curiae on behalf of Real Party in Interest, Cross-complainant and Appellant.

No appearance for Real Party in Interest and Respondent.

Daniel E. Lungren, Attorney General, N. Eugene Hill, Assistant Attorney General, Cathy Christian and Marsha A. Bedwell, Deputy Attorneys General, and Daniel G. Stone for Plaintiff and Respondent.

Gary D. Hori for Defendant, Cross-defendant and Respondent.

Richard J. Chivaro and Patricia A. Cruz for Cross-defendants and Respondents.

## OPINION

**SPARKS, Acting P. J.**—This appeal involves a decade-long battle over claims for subvention by two county superintendents of schools for reimbursement for mandated special education programs. Section 6 of article XIII B of the California Constitution directs, with exceptions not relevant here, that "[w]henever the Legislature or any State agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, . . . ." The issue on appeal is whether the special education programs in question constituted new programs or higher levels of service mandated by the state entitling the school districts to reimbursement under section 6 of article XIII B of the California Constitution and related statutes for the cost of implementing them or whether these programs were instead mandated by the federal government for which no reimbursement is due.

The Santa Barbara County Superintendent of Schools and the Riverside County Superintendent of Schools each filed claims with the Board of Control for state reimbursement for alleged state-mandated costs incurred in connection with special education programs. After a lengthy administrative process, the Board of Control rendered a decision finding that all local special education costs were state mandated and subject to state reimbursement. That decision was then successfully challenged in the Sacramento County Superior Court. The superior court entered a judgment by which it: (1) issued a writ of administrative mandate (Code Civ. Proc., § 1094.5), directing the Commission on State Mandates (the successor to the Board of

Control) to set aside the administrative decision and to reconsider the matter in light of the California Supreme Court's intervening decision in *City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51 [266 Cal.Rptr. 139, 785 P.2d 522]; and (2) denied the Riverside County Superintendent of School's petition for a writ of mandate (Code Civ. Proc., § 1085), which would have directed the State Controller to issue a warrant in payment of the claim. The Riverside County Superintendent of Public Schools appeals. We shall clarify the criteria to be applied by the Commission on State Mandates on remand and affirm the judgment.

## I. *The Parties*

This action was commenced in July 1987 by Jesse R. Huff, then the Director of the California Department of Finance. Huff petitioned for a writ of administrative mandate to set aside the administrative decision which found all the special education costs to be state mandated. On appeal Huff appears as a respondent urging that we affirm the judgment.

The Commission on State Mandates (the Commission) is the administrative agency which now has jurisdiction over local agency claims for reimbursement for state-mandated costs. (Gov. Code, § 17525.) In this respect the Commission is the successor to the Board of Control. The Board of Control rendered the administrative decision which is at issue here. Since an appropriation for payment of these claims was not included in a local government claims bill before January 1, 1985, administrative jurisdiction over the claims has been transferred from the Board of Control to the Commission. (Gov. Code, § 17630.) The Commission is the named defendant in the petition for a writ of administrative mandate. In the trial court and on appeal the Commission has appeared as the agency having administrative jurisdiction over the claims, but has not expressed a position on the merits of the litigation.

The Santa Barbara County Superintendent of Schools (hereafter Santa Barbara) is a claimant for state reimbursement of special education costs incurred in the 1979-1980 fiscal year. Santa Barbara is a real party in interest in the proceeding for administrative mandate. Santa Barbara has not appealed from the judgment of the superior court and, although a nominal respondent on appeal, has not filed a brief in this court.

The Riverside County Superintendent of Schools (hereafter Riverside) represents a consortium of school districts which joined together to provide special education programs to handicapped students. Riverside seeks reimbursement for special education costs incurred in the 1980-1981 fiscal year.

Riverside is a real party in interest in the proceeding for writ of administrative mandate. It filed a cross-petition for a writ of mandate directing the Controller to pay its claim. Riverside is the appellant in this appeal.

The State of California and the State Treasurer are named cross-defendants in Riverside's cross-petition for a writ of mandate. They joined with Huff in this litigation. The State Controller is the officer charged with drawing warrants for the payment of moneys from the State Treasury upon a lawful appropriation. (Cal. Const., art. XVI, § 7.) The State Controller is a named defendant in Riverside's petition for a writ of mandate. In the trial court and on appeal the State Controller expresses no opinion on the merits of Riverside's reimbursement claim, but asserts that the courts lack authority to compel him to issue a warrant for payment of the claim in the absence of an appropriation for payment of the claim.

In addition to the briefing by the parties on appeal, we have permitted a joint amici curiae brief to be filed in support of Riverside by the Monterey County Office of Education, the Monterey County Office of Education Special Education Local Planning Area, and 21 local school districts.

## II. *Factual and Procedural Background*

The Legislature has provided an administrative remedy for the resolution of local agency claims for reimbursement for state mandates. In *County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62 [222 Cal.Rptr. 750], at pages 71 and 72, we described these procedures as follows (with footnotes deleted): "Section 2250 [Revenue & Taxation Code] and those following it provide a hearing procedure for the determination of claims by local governments. The State Board of Control is required to hear and determine such claims. (§ 2250.) For purposes of such hearings the board consists of the members of the Board of Control provided for in part 4 (commencing with § 13900) of division 3 of title 2 of the Government Code, together with two local government officials appointed by the Governor. (§ 2251.) The board was required to adopt procedures for receiving and hearing such claims. (§ 2252.) The first claim filed with respect to a statute or regulation is considered a 'test claim' or a 'claim of first impression.' (§ 2218, subd. (a).) The procedure requires an evidentiary hearing where the claimant, the Department of Finance, and any affected department or agency can present evidence. (§ 2252.) If the board determines that costs are mandated, then it must adopt parameters and guidelines for the reimbursement of such claims. (§ 2253.2.) The claimant or the state is entitled to commence an action in administrative mandate pursuant to Code of Civil Procedure section 1094.5 to set aside a decision of the board on the grounds that the board's decision is not supported by substantial evidence. (§ 2253.5.)

"At least twice each calendar year the board is required to report to the Legislature on the number of mandates it has found and the estimated statewide costs of these mandates. (§ 2255, subd. (a).) In addition to the estimate of the statewide costs for each mandate, the report must also contain the reasons for recommending reimbursement. (§ 2255, subd. (a).) Immediately upon receipt of the report a local government claims bill shall be introduced in the Legislature which, when introduced, must contain an appropriation sufficient to pay for the estimated costs of the mandates. (§ 2255, subd. (a).) In the event the Legislature deletes funding for a mandate from the local government claims bill, then it may take one of the following courses of action: (1) include a finding that the legislation or regulation does not contain a mandate; (2) include a finding that the mandate is not reimbursable; (3) find that a regulation contains a mandate and direct that the Office of Administrative Law repeal the regulation; (4) include a finding that the legislation or regulation contains a reimbursable mandate and direct that the legislation or regulation not be enforced against local entities until funds become available; (5) include a finding that the Legislature cannot determine whether there is a mandate and direct that the legislation or regulation shall remain in effect and be enforceable unless a court determines that the legislation or regulation contains a reimbursable mandate in which case the effectiveness of the legislation or regulation shall be suspended and it shall not be enforced against a local entity until funding becomes available; or (6) include a finding that the Legislature cannot determine whether there is a reimbursable mandate and that the legislation or regulation shall be suspended and shall not be enforced against a local entity until a court determines whether there is a reimbursable mandate. (§ 2255, subd. (b).) If the Legislature deletes funding for a mandate from a local government claims bill but does not follow one of the above courses of action or if a local entity believes that the action is not consistent with article XIII B of the Constitution, then the local entity may commence a declaratory relief action in the Superior Court of the County of Sacramento to declare the mandate void and enjoin its enforcement. (§ 2255, subd. (c).)

"Effective January 1, 1985, the Legislature has established a new commission to consider and determine claims based upon state mandates. This is known as the Commission on State Mandates and it consists of the Controller, the Treasurer, the Director of Finance, the Director of the Office of Planning and Research, and a public member with experience in public finance, appointed by the Governor and approved by the Senate. (Gov. Code, § 17525.) 'Costs mandated by the state' are defined as 'any increased costs which a local agency or school district is required to incur after July 1, 1980, as a result of any statute enacted after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which

mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution.' (Gov. Code, § 17514.) The procedures before the Commission are similar to those which were followed before the Board of Control. (Gov. Code, § 17500 et seq.) Any claims which had not been included in a local government claims bill prior to January 1, 1985, were to be transferred to and considered by the commission. (Gov. Code, § 17630; [Rev. & Tax. Code,] § 2239.)"

On October 31, 1980, Santa Barbara filed a test claim with the Board of Control seeking reimbursement for costs incurred in the 1979-1980 fiscal year in connection with the provision of special education services as required by Statutes 1977, chapter 1247, and Statutes 1980, chapter 797. Santa Barbara asserted that these acts should be considered an ongoing requirement of increased levels of service.

Santa Barbara's initial claim was based upon the "mandate contained in the two bills specified above [which require] school districts and county offices to provide full and formal due process procedures and hearings to pupils and parents regarding the special education assessment, placement and the appropriate education of the child." Santa Barbara asserted that state requirements exceeded those of federal law as reflected in section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).[1] Santa Barbara's initial claim was for $10,500 in state-mandated costs for the 1979-1980 fiscal year.

During the administrative proceedings Santa Barbara amended its claim to reflect the following state-mandated activities alleged to be in excess of federal requirements: (1) the extension of eligibility to children younger and older than required by federal law; (2) the establishment of procedures to search for and identify children with special needs; (3) assessment and evaluation; (4) the preparation of "Individual Education Plans" (IEP's); (5) due process hearings in placement determinations; (6) substitute teachers; and (7) staff development programs. Santa Barbara was claiming reimbursement in excess of $520,000 for the cost of these services during the 1979-1980 fiscal year.

---

[1]Section 794 of title 29 of the United States Code will of necessity play an important part in our discussion of the issues presented in this case. That provision was enacted as section 504 of the Rehabilitation Act of 1973. (Pub.L. No. 93-112, tit. V, § 504 (Sept. 26, 1973) 87 Stat. 394.) It has been amended several times. (Pub.L. No. 95-602, tit. I, §§ 119, 122(d)(2) (Nov. 6, 1978) 92 Stat. 2982, 2987 [Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978]; Pub.L. No. 99-506, tit. I, § 103(d)(2)(B), tit. X, § 1002(e)(4) (Oct. 21, 1986) 100 Stat. 1810, 1844; Pub.L. No. 100-259, § 4 (Mar. 22, 1988) 102 Stat. 29; Pub.L. No. 100-630, tit. II, § 206(d) (Nov. 7, 1988) 102 Stat. 3312.) The decisional authorities universally refer to the statute as "section 504." We will adhere to this nomenclature and subsequent references to section 504 will refer to title 29, United States Code, section 794.

Also, during the administrative proceedings the focus of federally mandated requirements shifted from section 504 of the Rehabilitation Act to federal Public Law No. 94-142, which amended the Education of the Handicapped Act. (20 U.S.C. § 1401 et seq.)[2]

The Board of Control adopted a decision denying Santa Barbara's claim. The board concluded that the Education of the Handicapped Act resulted in costs mandated by the federal government, that state special education requirements exceed those of federal law, but that "the resulting mandate is not reimbursable because the Legislature already provides funding for all Special Education Services through an appropriation in the annual Budget Act."

Santa Barbara sought judicial review by petition for a writ of administrative mandate. The superior court found the administrative record and the Board of Control's findings to be inadequate. Judgment was rendered requiring the Board of Control to set aside its decision and to rehear the matter to establish a proper record, including findings. That judgment was not appealed.

On October 30, 1981, Riverside filed a test claim for reimbursement of $474,477 in special education costs incurred in the 1980-1981 fiscal year. Riverside alleged that the costs were state mandated by chapter 797 of Statutes 1980. The basis of Riverside's claim was Education Code section 56760, a part of the state special education funding formula which, according to Riverside, "mandates a 10% cap on ratio of students served by special education and within that 10% mandates the ratio of students to be served by certain services." Riverside explained that chapter 797 of Statutes 1980 was enacted as urgency legislation effective July 28, 1980, and that at that time it was already "locked into" providing special education services to more than 13 percent of its students in accordance with prior state law and funding formulae.[3]

The Riverside claim, like Santa Barbara's, evolved over time with increases in the amount of reimbursement sought. Eventually the Board of

[2]The Education of the Handicapped Act was enacted in 1970. (Pub.L. No. 91-230, tit. VI (Apr. 13, 1970) 84 Stat. 175.) It has been amended many times. The amendment of primary interest here was enacted as the Education for All Handicapped Children Act of 1975. (Pub.L. No. 94-142 (Nov. 29, 1975) 89 Stat. 774.) The 1975 legislation significantly amended the Education of the Handicapped Act, but did not change its short title. The Education of the Handicapped Act has now been renamed the Individuals with Disabilities Education Act. (Pub.L. No. 101-476, tit. IX, § 901(b)(21) (Oct. 30, 1990) 104 Stat. 1143; Pub.L. No. 101-476, tit. IX, § 901b; Pub.L. No. 102-119, § 25(b) (Oct. 7, 1991) 105 Stat. 607.) Since at all times relevant here the federal act was known as the Education of the Handicapped Act, we will adhere to that nomenclature.

[3]The 1980 legislation required that a local agency adopt an annual budget plan for special education services. (Ed. Code, § 56200.) Education Code section 56760 provided that in

Control denied Riverside's claim for the same reasons the Santa Barbara claim was denied. Riverside sought review by petition for a writ of administrative mandate. In its decision the superior court accepted the board's conclusions that the Education of the Handicapped Act constitutes a federal mandate and that state requirements exceed those of the federal mandate. However, the court disagreed with the board that any appropriation in the state act necessarily satisfies the state's subvention obligation. The court concluded that the Board of Control had failed to consider whether the state had fully reimbursed local districts for the state-mandated costs which were in excess of the federal mandate, and the matter was remanded for consideration of that question. That judgment was not appealed.

On return to the Board of Control, the Santa Barbara claim and the Riverside claim were consolidated. The Board of Control adopted a decision holding that all special education costs under Statutes 1977, chapter 1247, and Statutes 1980, chapter 797, are state-mandated costs subject to subvention. The board reasoned that the federal Education of the Handicapped Act is a discretionary program and that section 504 of the Rehabilitation Act does not require school districts to implement any programs in response to federal law, and therefore special education programs are optional in the absence of a state mandate.

The claimants were directed to draft, and the Board of Control adopted, parameters and guidelines for reimbursement of special education costs. The board submitted a report to the Legislature estimating that the total statewide cost of reimbursement for the 1980-1981 through 1985-1986 fiscal years would be in excess of $2 billion. Riverside's claim for reimbursement for the 1980-1981 fiscal year was now in excess of $7 million. Proposed legislation which would have appropriated funds for reimbursement of special education costs during the 1980-1981 through 1985-1986 fiscal years failed to pass in the Legislature. (Sen. Bill No. 1082 (1985-1986 Reg. Sess.).) A separate bill which would have appropriated funds to reimburse Riverside

the local budget plan the ratio of students to be served should not exceed 10 percent of total enrollment. However, those proportions could be waived for undue hardship by the Superintendent of Public Instruction. (Ed. Code, §§ 56760, 56761.) In addition, the 1980 legislation included provisions for a gradual transition to the new requirements. (Ed. Code, § 56195 et seq.) The transitional provisions included a guarantee of state funding for 1980-1981 at prior student levels with an inflationary adjustment of 9 percent. (Ed. Code, § 56195.8.) The record indicates that Riverside applied for a waiver of the requirements of Education Code section 56760, but that the waiver request was denied due to a shortage of state funding. It also appears that Riverside did not receive all of the 109 percent funding guarantee under Education Code section 56195.8. In light of the current posture of this appeal we need not and do not consider whether the failure of the state to appropriate sufficient funds to satisfy its obligations under the 1980 legislation can be addressed in a proceeding for the reimbursement of state-mandated costs or must be addressed in some other manner.

for its 1980-1981 claim also failed to pass. (Sen. Bill No. 238 (1987-1988 Reg. Sess.).)

At this point Huff, as Director of the Department of Finance, brought an action in administrative mandate seeking to set aside the decision of the Board of Control. Riverside cross-petitioned for a writ of mandate directing the state, the Controller and the Treasurer to issue a warrant in payment of its claim for the 1980-1981 fiscal year.

The superior court concluded that the Board of Control did not apply the appropriate standard in determining whether any portion of local special education costs are incurred pursuant to a federal mandate. The court found that the definition of a federal mandate set forth by the *Supreme Court in City of Sacramento* v. *State of California, supra,* 50 Cal.3d 51, "marked a departure from the narrower 'no discretion' test" of this court's earlier decision in *City of Sacramento* v. *State of California* (1984) 156 Cal.App.3d 182 [203 Cal.Rptr. 258]. It further found that the standard set forth in the high court's decision in *City of Sacramento* "is to be applied retroactively." Accordingly, the superior court issued a peremptory writ of mandate directing the Commission on State Mandates to set aside the decision of the Board of Control, to reconsider the claims in light of the decision in *City of Sacramento* v. *State of California, supra,* 50 Cal.3d 51, and "to ascertain whether certain costs arising from Chapter 797/80 and Chapter 1247/77 are federally mandated, and if so, the extent, if any, to which the state-mandated costs exceed the federal mandate." Riverside's cross-petition for a writ of mandate was denied. This appeal followed.

### III. *Principles of Subvention*

■ "Subvention" generally means a grant of financial aid or assistance, or a subsidy. (See Webster's Third New Internat. Dict. (1971) p. 2281.) As used in connection with state-mandated costs, the basic legal requirements of subvention can be easily stated; it is in the application of the rule that difficulties arise.

Essentially, the constitutional rule of state subvention provides that the state is required to pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies. (*County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 56 [233 Cal.Rptr. 38, 729 P.2d 202].) This does not mean that the state is required to reimburse local agencies for any incidental cost that may result from the enactment of a state law; rather, the subvention requirement is restricted to governmental services which the local agency is required by

state law to provide to its residents. (*City of Sacramento* v. *State of California, supra,* 50 Cal.3d at p. 70.) The subvention requirement is intended to prevent the state from transferring the costs of government from itself to local agencies. (*Id.* at p. 68.) Reimbursement is required when the state "freely chooses to impose on local agencies *any* peculiarly 'governmental' cost which they were not previously required to absorb." (*Id.* at p. 70, italics in original.)

The requirement of subvention for state-mandated costs had its genesis in the "Property Tax Relief Act of 1972" which is also known as "SB 90" (Senate Bill No. 90). (*City of Sacramento* v. *State of California, supra,* 156 Cal.App.3d at p. 188.) That act established limitations upon the power of local governments to levy taxes and concomitantly prevented the state from imposing the cost of new programs or higher levels of service upon local governments. (*Ibid.*) The Legislature declared: "It is the intent in establishing the tax rate limits in this chapter to establish limits that will be flexible enough to allow local governments to continue to provide existing programs, that will be firm enough to insure that the property tax relief provided by the Legislature will be long lasting and that will afford the voters in each local government jurisdiction a more active role in the fiscal affairs of such jurisdictions." (Rev. & Tax. Code, former § 2162, Stats. 1972, ch. 1406, § 14.7, p. 2961.)[4] The act provided that the state would pay each county, city and county, city, and special district the sums which were sufficient to cover the total cost of new state-mandated costs. (See Rev. & Tax. Code, former § 2164.3, Stats. 1972, ch. 1406, § 14.7, pp. 2962-2963.) New state-mandated costs would arise from legislative action or executive regulation after January 1, 1973, which mandated a new program or higher level of service under an existing mandated program. (*Ibid.*)

 ██ ██ Senate Bill No. 90 did not specifically include school districts in the group of agencies entitled to reimbursement for state-mandated costs.[5] (Rev. & Tax. Code, former § 2164.3, Stats. 1972, ch. 1406, § 14.7,

---

[4]In addition to requiring subventions for new state programs and higher levels of service, Senate Bill No. 90 required the state to reimburse local governments for revenues lost by the repeal or reduction of property taxes on certain classes of property. In this connection the Legislature said: "It is the purpose of this part to provide property tax relief to the citizens of this state, as undue reliance on the property tax to finance various functions of government has resulted in serious detriment to one segment of the taxpaying public. The subventions from the State General Fund required under this part will serve to partially equalize tax burdens among all citizens, and the state as a whole will benefit." (Gov. Code, § 16101, Stats. 1972, ch. 1406, § 5, p. 2953.)

[5]A school district's relationship to the state is different from that of local governmental entities such as cities, counties, and special districts. Education and the operation of the public school system are matters of statewide rather than local or municipal concern. (*California*

pp. 2962-2963.) In fact, at that time methods of financing education in this state were undergoing fundamental reformation as the result of the litigation in *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]. At the time of the *Serrano* decision local property taxes were the primary source of school revenue. (*Id.* at p. 592.) In *Serrano*, the California Supreme Court held that education is a fundamental interest, that wealth is a suspect classification, and that an educational system which produces disparities of opportunity based upon district wealth would violate principles of equal protection. (*Id.* at pp. 614-615, 619.) A major portion of Senate Bill No. 90 constituted new formulae for state and local contributions to education in a legislative response to the decision in *Serrano*. (Stats. 1972, ch. 1406, §§ 1.5-2.74, pp. 2931-2953. See *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 736-737 [135 Cal.Rptr. 345, 557 P.2d 929].)[6]

The provisions of Senate Bill No. 90 were amended and refined in legislation enacted the following year. (Stats. 1973, ch. 358.) Revenue and Taxation Code section 2231, subdivision (a), was enacted to require the state to reimburse local agencies, including school districts, for the full costs of new programs or increased levels of service mandated by the Legislature after January 1, 1973. Local agencies except school districts were also entitled to reimbursement for costs mandated by executive regulation after January 1, 1973. (Rev. & Tax. Code, § 2231, subd. (d), added by Stats. 1973,

---

*Teachers Assn.* v. *Huff* (1992) 5 Cal.App.4th 1513, 1524 [7 Cal.Rptr.2d 699].) Local school districts are agencies of the state and have been described as quasi-municipal corporations. (*Ibid.*) They are not distinct and independent bodies politic. (*Ibid.*) The Legislature's power over the public school system has been described as exclusive, plenary, absolute, entire, and comprehensive, subject only to constitutional constraints. (*Ibid.*) The Legislature has the power to create, abolish, divide, merge, or alter the boundaries of school districts. (*Id.* at p. 1525.) The state is the beneficial owner of all school properties and local districts hold title as trustee for the state. (*Ibid.*) School moneys belong to the state and the apportionment of funds to a school district does not give the district a proprietary interest in the funds. (*Ibid.*) While the Legislature has chosen to encourage local responsibility for control of public education through local school districts, that is a matter of legislative choice rather than constitutional compulsion and the authority that the Legislature has given to local districts remains subject to the ultimate and nondelegable responsibility of the Legislature. (*Id.* at pp. 1523-1524.)

[6]After the first *Serrano* decision, the United States Supreme Court held that equal protection does not require dollar-for-dollar equality between school districts. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 33-34 48-56, 61-62 [36 L.Ed.2d 16, 42-43, 51-56, 59-60, 93 S.Ct. 1278].) In the second *Serrano* decision, the California Supreme Court adhered to the first *Serrano* decision on independent state grounds. (*Serrano* v. *Priest, supra,* 18 Cal.3d at pp. 761-766.) The court concluded that Senate Bill No. 90 and Assembly Bill No. 1267, enacted the following year (Stats. 1973, ch. 208, p. 529 et seq.), did not satisfy equal protection principles. (*Serrano* v. *Priest, supra,* 18 Cal.3d at pp. 776-777.) Additional complications in educational financing arose as the result of the enactment of article XIII A of the California Constitution at the June 1978 Primary Election (Proposition 13), which limited the taxes which can be imposed on real property and forced the state to assume greater responsibility for financing education (see Ed. Code, § 41060), and the enactment of Propositions 98 and 111 in 1988 and 1990, respectively, which provide formulae for minimum state funding for education. (See generally *California Teachers Assn.* v. *Huff, supra,* 5 Cal.App.4th 1513.)

ch. 358, § 3, p. 783 and repealed by Stats. 1986, ch. 879, § 23, p. 3045.) In subsequent years legislation was enacted to entitle school districts to subvention for state-mandated costs imposed by legislative acts after January 1, 1973, or by executive regulation after January 1, 1978. (Rev. & Tax. Code, former § 2207.5, added by Stats. 1977, ch. 1135, § 5, p. 3646 and amended by Stats. 1980, ch. 1256, § 5, pp. 4248-4249.)

In the 1973 legislation, Revenue and Taxation Code section 2271 was enacted to provide, among other things: "A local agency may levy, or have levied on its behalf, a rate in addition to the maximum property tax rate established pursuant to this chapter (commencing with Section 2201) to pay costs mandated by the federal government or costs mandated by the courts or costs mandated by initiative enactment, which are not funded by federal or state government." ■ In this respect costs mandated by the federal government are exempt from an agency's taxing and spending limits. (*City of Sacramento v. State of California, supra,* 50 Cal.3d at p. 71, fn. 17.)

At the November 6, 1979, General Election, the voters added article XIII B to the state Constitution by enacting Proposition 4. That article imposes spending limits on the state and all local governments. For purposes of article XIII B the term "local government" includes school districts. (Cal. Const., art. XIII B, § 8, subd. (d).) The measure accomplishes its purpose by limiting a governmental entity's annual appropriations to the prior year's appropriations limit adjusted for changes in the cost of living and population growth, except as otherwise provided in the article. (Cal. Const., art. XIII B, § 1.)[7] The appropriations subject to limitation do not include, among other things: "Appropriations required to comply with mandates of the courts or the federal government which, without discretion, require an expenditure for additional services or which unavoidably make the provision of existing services more costly." (Cal. Const., art. XIII B, § 9, subd. (b).)

Like its statutory predecessor, the constitutional initiative measure includes a provision designed "to preclude the state from shifting to local agencies the financial responsibility for providing public services in view of these restrictions on the taxing and spending power of the local entities." (*Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830, 835-836 [244 Cal.Rptr. 677, 750 P.2d 318].) Section 6 of article XIII B of the state Constitution provides: "Whenever the Legislature or any State agency mandates a new program or higher level of service on any local government, the

---

[7]As it was originally enacted, article XIII B required that all governmental entities return revenues in excess of their appropriations limits to the taxpayers through tax rate or fee schedule revisions. In Proposition 98, adopted at the November 1988 General Election, article XIII B was amended to provide that half of state excess revenues would be transferred to the state school fund for the support of school districts and community college districts. (See Cal. Const., art. XVI, § 8.5; *California Teachers Assn.* v. *Huff, supra,* 5 Cal.App.4th 1513.)

State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

Although article XIII B of the state Constitution requires subvention for state mandates enacted after January 1, 1975, the article had an effective date of July 1, 1980. (Cal. Const., art. XIII B, § 10.) ▇ Accordingly, under the constitutional provision, a local agency may seek subvention for costs imposed by legislation after January 1, 1975, but reimbursement is limited to costs incurred after July 1, 1980. (*City of Sacramento v. State of California, supra,* 156 Cal.App.3d at pp. 190-193.) Reimbursement for costs incurred before July 1, 1980, must be obtained, if at all, under controlling statutory law. (See 68 Ops.Cal.Atty.Gen. 244 (1985).)

The constitutional subvention provision, like the statutory scheme before it, requires state reimbursement whenever "the Legislature or any State agency" mandates a new program or higher level of service. (Cal. Const., art. XIII B, § 6.) Accordingly, it has been held that state subvention is not required when the federal government imposes new costs on local governments. (*City of Sacramento v. State of California, supra,* 156 Cal.App.3d at p. 188; see also *Carmel Valley Fire Protection Dist. v. State of California* (1987) 190 Cal.App.3d 521, 543 [234 Cal.Rptr. 795].) In our *City of Sacramento* decision this court held that a federal program in which the state participates is not a federal mandate, regardless of the incentives for participation, unless the program leaves state or local government with no discretion as to alternatives. (156 Cal.App.3d at p. 198.)

In its *City of Sacramento* opinion,[8] the California Supreme Court rejected this court's earlier formulation. In doing so the high court noted that the vast bulk of cost-producing federal influence on state and local government is by inducement or incentive rather than direct compulsion. (50 Cal.3d at p. 73.) However, "certain regulatory standards imposed by the federal government

[8]The Supreme Court's decision in *City of Sacramento* was not a result of direct review of this court's decision. The Supreme Court denied a petition for review of this court's *City of Sacramento* decision. After the Board of Control had adopted parameters and guidelines for reimbursement under this court's decision, the Legislature failed to appropriate the funds necessary for such reimbursement. The litigation which resulted in the Supreme Court's *City of Sacramento* decision was commenced as an action to enforce the result on remand from this court's *City of Sacramento* decision. (See 50 Cal.3d at p. 60.)

under 'cooperative federalism' schemes are coercive on the states and localities in every practical sense." (*Id.* at pp. 73-74.) The test for determining whether there is a federal mandate is whether compliance with federal standards "is a matter of true choice," that is, whether participation in the federal program "is truly voluntary." (*Id.* at p. 76.) The court went on to say: "Given the variety of cooperative federal-state-local programs, we here attempt no final test for 'mandatory' versus 'optional' compliance with federal law. A determination in each case must depend on such factors as the nature and purpose of the federal program; whether its design suggests an intent to coerce; when state and/or local participation began; the penalties, if any, assessed for withdrawal or refusal to participate or comply; and any other legal and practical consequences of nonparticipation, noncompliance, or withdrawal." (*Ibid.*)

## IV. *Special Education*

The issues in this case cannot be resolved by consideration of a particular federal act in isolation. Rather, reference must be made to the historical and legal setting of which the particular act is a part. Our consideration begins in the early 1970's.

In considering the 1975 amendments to the Education of the Handicapped Act, Congress referred to a series of "landmark court cases" emanating from 36 jurisdictions which had established the right to an equal educational opportunity for handicapped children. (See *Smith* v. *Robinson* (1984) 468 U.S. 992, 1010 [82 L.Ed.2d 746, 763, 104 S.Ct. 3457].) Two federal district court cases, *Pennsylvania Ass'n, Ret'd Child.* v. *Commonwealth of Pa.* (E.D.Pa. 1972) 343 F.Supp. 279 (see also *Pennsylvania Ass'n, Retard. Child.* v. *Commonwealth of Pa.* (E.D.Pa. 1971) 334 F.Supp. 1257), and *Mills* v. *Board of Education of District of Columbia* (D.D.C. 1972) 348 F.Supp. 866, were the most prominent of these judicial decisions. (See *Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley* (1982) 458 U.S. 176, 180, fn. 2 [73 L.Ed.2d 690, 695, 102 S.Ct. 3034].)

In the Pennsylvania case, an association and the parents of certain retarded children brought a class action against the commonwealth and local school districts in the commonwealth, challenging the exclusion of retarded children from programs of education and training in the public schools. (*Pennsylvania Ass'n, Ret'd. Child.* v. *Commonwealth of Pa., supra,* 343 F.Supp. at p. 282.) The matter was assigned to a three-judge panel which heard evidence on the plaintiffs' due process and equal protection claims. (*Id.* at p. 285.) The parties then agreed to resolve the litigation by means of a consent

judgment. (*Ibid.*) The consent agreement required the defendants to locate and evaluate all children in need of special education services, to reevaluate placement decisions periodically, and to accord due process hearings to parents who are dissatisfied with placement decisions. (*Id.* at pp. 303-306.) It required the defendants to provide "a free public program of education and training appropriate to the child's capacity." (*Id.* at p. 285, italics deleted.)

In view of the consent agreement the district court was not required to resolve the plaintiffs' equal protection and due process contentions. Rather, it was sufficient for the court to find that the suit was not collusive and that the plaintiffs' claims were colorable. The court found: "Far from an indication of collusion, however, the Commonwealth's willingness to settle this dispute reflects an intelligent response to overwhelming evidence against [its] position." (*Pennsylvania Ass'n, Ret'd. Child.* v. *Commonwealth of Pa.*, *supra*, 343 F.Supp. at p. 291.) The court said that it was convinced the due process and equal protection claims were colorable. (*Id.* at pp. 295-296.)

In the *Mills* case, an action was brought on behalf of a number of school-age children with exceptional needs who were excluded from the Washington, D.C., public school system. (*Mills* v. *Board of Education of District of Columbia, supra*, 348 F.Supp. at p. 868.) The district court concluded that equal protection entitled the children to a public-supported education appropriate to their needs and that due process required a hearing with respect to classification decisions. (*Id.* at pp. 874-875.) The court said: "If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such manner that no child is entirely excluded from a publicly supported education consistent with his needs and ability to benefit therefrom. The inadequacies of the District of Columbia Public School System whether occasioned by insufficient funding or administrative inefficiency, certainly cannot be permitted to bear more heavily on the 'exceptional' or handicapped child than on the normal child." (*Id.* at p. 876.)

In the usual course of events, the development of principles of equal protection and due process as applied to special education, which had just commenced in the early 1970's with the authorities represented by the *Pennsylvania* and *Mills* cases, would have been fully expounded through appellate processes. However, the necessity of judicial development was truncated by congressional action. In the Rehabilitation Act of 1973, section 504, Congress provided: "No otherwise qualified handicapped individual in the United States, as defined in section 706(7) [now 706(8)] of this title,

shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." (29 U.S.C. § 794, Pub.L. No. 93-112, tit. V, § 504 (Sept. 26, 1973) 87 Stat. 394.)[9] Since federal assistance to education is pervasive (see, e.g., Ed. Code, §§ 12000-12405, 49540 et seq., 92140 et seq.), section 504 was applicable to virtually all public educational programs in this and other states.

The Department of Health, Education and Welfare (HEW) promulgated regulations to ensure compliance with section 504 by educational agencies.[10] The regulations required local educational agencies to locate and evaluate handicapped children in order to provide appropriate educational opportunities and to provide administrative hearing procedures in order to resolve disputes. The federal courts concluded that section 504 was essentially a codification of the equal protection rights of citizens with disabilities. (See *Halderman* v. *Pennhurst State School & Hospital* (E.D.Pa. 1978) 446 F.Supp. 1295, 1323.) Courts also held that section 504 embraced a private cause of action to enforce its requirements. (*Sherry* v. *New York State Ed. Dept.* (W.D.N.Y. 1979) 479 F.Supp. 1328, 1334; *Doe* v. *Marshall* (S.D.Tex. 1978) 459 F.Supp. 1190, 1192.) It was further held that section 504 imposed upon school districts and other public educational agencies "the duty of analyzing individually the needs of each handicapped student and devising a program which will enable each individual handicapped student to receive an appropriate, free public education. The failure to perform this analysis and structure a program suited to the needs of each handicapped child, constitutes discrimination against that child and a failure to provide an appropriate, free

---

[9]In section 119 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978, the application of section 504 was extended to federal executive agencies and the United States Postal Service. (Pub.L. No. 95-602, tit. I, § 119 (Nov. 6, 1978) 92 Stat. 2982.) The section is now subdivided and includes subdivision (b), which provides that the section applies to all of the operations of a state or local governmental agency, including local educational agencies, if the agency is extended federal funding for any part of its operations. (29 U.S.C. § 794.) This latter amendment was in response to judicial decisions which had limited the application of section 504 to the particular activity for which federal funding is received. (See *Consolidated Rail Corporation* v. *Darrone* (1984) 465 U.S. 624,635-636 [79 L.Ed.2d 568, 577-578, 104 S.Ct. 1248].)

[10]HEW was later dissolved and its responsibilities are now shared by the federal Department of Education and the Department of Health and Human Services. The promulgation of regulations to enforce section 504 had a somewhat checkered history. Initially HEW determined that Congress did not intend to require it to promulgate regulations. The Senate Public Welfare Committee then declared that regulations were intended. By executive order and by judicial decree in *Cherry* v. *Mathews* (D.D.C. 1976) 419 F.Supp. 922, HEW was required to promulgate regulations. The ensuing regulations were embodied in title 45 Code of Federal Regulations part 84, and are now located in title 34 Code of Federal Regulations part 104. (See *Southeastern Community College* v. *Davis* (1979) 442 U.S. 397, 404, fn. 4 [60 L.Ed.2d 980, 987, 99 S.Ct. 2361]; *N. M. Ass'n for Retarded Citizens* v. *State of N. M.* (10th Cir. 1982) 678 F.2d 847, 852.)

public education for the handicapped child." (*Doe* v. *Marshall, supra,* 459 F.Supp. at p. 1191. See also *David H.* v. *Spring Branch Independent School Dist.* (S.D.Tex. 1983) 569 F.Supp. 1324, 1334; *Halderman* v. *Pennhurst State School & Hospital, supra,* 446 F.Supp. at p. 1323.)

■ Throughout these proceedings Riverside, relying upon the decision in *Southeastern Community College* v. *Davis, supra,* 442 U.S. 397 [60 L.Ed.2d 980], has contended that section 504 cannot be considered a federal mandate because it does not obligate local school districts to take any action to accommodate the needs of handicapped children so long as they are not excluded from school. That assertion is not correct.

In the *Southeastern Community College* case a prospective student with a serious hearing disability sought to be admitted to a postsecondary educational program to be trained as a registered nurse. As a result of her disability the student could not have completed the academic requirements of the program and could not have attended patients without full-time personal supervision. She sought to require the school to waive the academic requirements, including an essential clinical program, which she could not complete and to otherwise provide full-time personal supervision. That demand, the Supreme Court held, was beyond the scope of section 504, which did not require the school to modify its program affirmatively and substantially. (442 U.S. at pp. 409-410 [60 L.Ed.2d at pp. 990-991].)

The *Southeastern Community College* decision is inapposite. States typically do not guarantee their citizens that they will be admitted to, and allowed to complete, specialized postsecondary educational programs. State educational institutions often impose stringent admittance and completion requirements for such programs in higher education. In the *Southeastern Community College* case the Supreme Court simply held that an institution of higher education need not lower or effect substantial modifications of its standards in order to accommodate a handicapped person. (442 U.S. at p. 413 [60 L.Ed.2d at pp. 992-993].) The court did not hold that a primary or secondary educational agency need do nothing to accommodate the needs of handicapped children. (See *Alexander* v. *Choate* (1985) 469 U.S. 287, 301 [83 L.Ed.2d 661, 672, 105 S.Ct. 712].)

States typically do purport to guarantee all of their children the opportunity for a basic education. In fact, in this state basic education is regarded as a fundamental right. (*Serrano* v. *Priest, supra,* 18 Cal.3d at pp. 765-766.) All basic educational programs are essentially affirmative action activities in the sense that educational agencies are required to evaluate and accommodate

the educational needs of the children in their districts. Section 504 would not appear to permit local agencies to accommodate the educational needs of some children while ignoring the needs of others due to their handicapped condition. (Compare *Lau* v. *Nichols* (1974) 414 U.S. 563 [39 L.Ed.2d 1, 94 S.Ct. 786], which required the San Francisco Unified School District to take affirmative steps to accommodate the needs of non-English speaking students under section 601 of the Civil Rights Act of 1964.)

Riverside's view of section 504 is inconsistent with congressional intent in enacting it. The congressional record makes it clear that section 504 was perceived to be necessary not to combat affirmative animus but to cure society's benign neglect of the handicapped. The record is replete with references to discrimination in the form of the denial of special educational assistance to handicapped children. In *Alexander* v. *Choate, supra,* 469 U.S. at pages 295 to 297 [83 L.Ed.2d at pages 668-669], the Supreme Court took note of these comments in concluding that a violation of section 504 need not be proven by evidence of purposeful or intentional discrimination. With respect to the *Southeastern Community College* v. *Davis, supra,* 442 U.S. 397 case, the high court said: "The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made. . . ." (*Alexander* v. *Choate, supra,* 469 U.S. at p. 301 [83 L.Ed.2d at p. 672], fn. omitted.)

Federal appellate courts have rejected the argument that the *Southeastern Community College* case means that pursuant to section 504 local educational agencies need do nothing affirmative to accommodate the needs of handicapped children. (*N. M. Ass'n for Retarded Citizens* v. *State of N. M., supra,* 678 F.2d at pp. 852-853; *Tatro* v. *State of Texas* (5th Cir. 1980) 625 F.2d 557, 564 [63 A.L.R. Fed. 844].)[11] We are satisfied that section 504 does impose an obligation upon local school districts to accommodate the needs of handicapped children. However, as was the case with constitutional principles, full judicial development of section 504 as it relates to special education in elementary and secondary school districts was truncated by congressional action.

---

[11]Following a remand and another decision by the Court of Appeals, the *Tatro* litigation, *supra,* eventually wound up in the Supreme Court. (*Irving Independent School Dist.* v. *Tatro* (1984) 468 U.S. 883 [82 L.Ed.2d 664, 104 S.Ct. 3371].) However, by that time the Education of the Handicapped Act had replaced section 504 as the means for vindicating the education rights of handicapped children and the litigation was resolved, favorably for the child, under that act.

In 1974 Congress became dissatisfied with the progress under earlier efforts to stimulate the states to accommodate the educational needs of handicapped children. (*Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley, supra,* 458 U.S. at p. 180 [73 L.Ed.2d at p. 695].) These earlier efforts had included a 1966 amendment to the Elementary and Secondary Education Act of 1965, and the 1970 version of the Education of the Handicapped Act. (*Ibid.*) The prior acts had been grant programs that did not contain specific guidelines for a state's use of grant funds. (*Ibid.*) In 1974 Congress greatly increased federal funding for education of the handicapped and simultaneously required recipient states to adopt a goal of providing full educational opportunities to all handicapped children. (*Ibid.* [73 L.Ed.2d at pp. 695-696].) The following year Congress amended the Education of the Handicapped Act by enacting the Education for All Handicapped Children Act of 1975. (*Ibid.* [73 L.Ed.2d at p. 696].)

Since the 1975 amendment, the Education of the Handicapped Act has required recipient states to demonstrate a policy that assures all handicapped children the right to a free appropriate education. (20 U.S.C. § 1412(1).) ▮ The act is not merely a funding statute; rather, it establishes an enforceable substantive right to a free appropriate public education in recipient states. (*Smith* v. *Robinson, supra,* 468 U.S. at p. 1010 [82 L.Ed.2d at p. 764].) To accomplish this purpose the act incorporates the major substantive and procedural requirements of the "right to education" cases which were so prominent in the congressional consideration of the measure. (*Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley, supra,* 458 U.S. at p. 194 [73 L.Ed.2d at p. 704].) The substantive requirements of the act have been interpreted in a manner which is "strikingly similar" to the requirements of section 504 of the Rehabilitation Act of 1973. (*Smith* v. *Robinson, supra,* 468 U.S. at pp. 1016-1017 [82 L.Ed.2d at p. 768].) The Supreme Court has noted that Congress intended the act to establish " 'a basic floor of opportunity that would bring into compliance all school districts with the constitutional right to equal protection with respect to handicapped children.' " (*Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley, supra,* 458 U.S. at p. 200 [73 L.Ed.2d at p. 708] citing the House of Representatives Report.)[12]

It is demonstrably manifest that in the view of Congress the substantive requirements of the 1975 amendment to the Education of the Handicapped Act were commensurate with the constitutional obligations of state and local

---

[12]Consistent with its "basic floor of opportunity" purpose, the act does not require local agencies to maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children. Rather, the act requires that handicapped children be accorded meaningful access to a free public education, which means access that is sufficient to confer some educational benefit. (*Ibid.*)

educational agencies. Congress found that "State and local educational agencies have a responsibility to provide education for all handicapped children, but present financial resources are inadequate to meet the special educational needs of handicapped children;" and "it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law." (20 U.S.C. former § 1400(b)(8) & (9).)[13]

It is also apparent that Congress intended the act to achieve nationwide application: "It is the purpose of this chapter to assure that all handicapped children have available to them, within the time periods specified in section 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children." (20 U.S.C. former § 1400(c).)

In order to gain state and local acceptance of its substantive provisions, the Education of the Handicapped Act employs a "cooperative federalism" scheme, which has also been referred to as the "carrot and stick" approach. (See *City of Sacramento* v. *State of California, supra,* 50 Cal.3d at pp. 73-74; *City of Sacramento* v. *State of California, supra,* 156 Cal.App.3d at p. 195.) As an incentive Congress made substantial federal financial assistance available to states and local educational agencies that would agree to adhere to the substantive and procedural terms of the act. (20 U.S.C. §§ 1411, 1412.) For example, the administrative record indicates that for fiscal year 1979-1980, the base year for Santa Barbara's claim, California received $71.2 million in federal assistance, and during fiscal year 1980-1981, the base year for Riverside's claim, California received $79.7 million. We cannot say that such assistance on an ongoing basis is trivial or insubstantial.

Contrary to Riverside's argument, federal financial assistance was not the only incentive for a state to comply with the Education of the Handicapped Act. ■ Congress intended the act to serve as a means by which state and

---

[13]That Congress intended to enforce the Fourteenth Amendment to the United States Constitution in enacting the Education of the Handicapped Act has since been made clear. In *Dellmuth* v. *Muth* (1989) 491 U.S. 223 at pages 231 and 232 [105 L.Ed.2d 181, 189-191, 109 S.Ct. 2397], the court noted that Congress has the power under section 5 of the Fourteenth Amendment to abrogate a state's Eleventh Amendment immunity from suit in federal court, but concluded that the Education of the Handicapped Act did not clearly evince such a congressional intent. In 1990 Congress responded by expressly abrogating state sovereign immunity under the act. (20 U.S.C. § 1403.)

local educational agencies could fulfill their obligations under the equal protection and due process provisions of the Constitution and under section 504 of the Rehabilitation Act of 1973. Accordingly, where it is applicable the act supersedes claims under the Civil Rights Act (42 U.S.C. § 1983) and section 504 of the Rehabilitation Act of 1973, and the administrative remedies provided by the act constitute the exclusive remedy of handicapped children and their parents or other representatives. (*Smith* v. *Robinson, supra,* 468 U.S. at pp. 1009, 1013, 1019 [82 L.Ed.2d at pp. 763, 766, 769].)[14]

As a result of the exclusive nature of the Education of the Handicapped Act, dissatisfied parties in recipient states must exhaust their administrative remedies under the act before resorting to judicial intervention. (*Smith* v. *Robinson, supra,* 468 U.S. at p. 1011 [82 L.Ed.2d at p. 764].) This gives local agencies the first opportunity and the primary authority to determine appropriate placement and to resolve disputes. (*Ibid.*) If a party is dissatisfied with the final result of the administrative process then he or she is entitled to seek judicial review in a state or federal court. (20 U.S.C. § 1415(e)(2).) In such a proceeding the court independently reviews the evidence but its role is restricted to that of review of the local decision and the court is not free to substitute its view of sound educational policy for that of the local authority. (*Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley, supra,* 458 U.S. at pp. 206-207 [73 L.Ed.2d at p. 712].) And since the act provides the exclusive remedy for addressing a handicapped child's right to an appropriate education, where the act applies a party cannot pursue a cause of action for constitutional violations, either directly or under the Civil Rights Act (42 U.S.C. § 1983), nor can a party proceed under section 504 of the Rehabilitation Act of 1973. (*Smith* v. *Robinson, supra,* 468 U.S. at pp. 1013, 1020 [82 L.Ed.2d at pp. 766, 770].)

Congress's intention to give the Education of the Handicapped Act nation-wide application was successful. By the time of the decision in *Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley, supra,* all states except New Mexico had become recipients under the act. (458 U.S. at pp. 183-184 [73 L.Ed.2d at p. 698].) It is important at this point in our discussion to consider the experience of New Mexico, both because the Board of Control relied upon that state's failure to adopt the Education of the Handicapped Act as proof that the act is not federally mandated, and because it illustrates the consequences of a failure to adopt the act.

---

[14]In *Smith* v. *Robinson, supra,* the court concluded that since the Education of the Handicapped Act did not include a provision for attorney fees, a successful complainant was not entitled to an award of such fees even though such fees would have been available in litigation under section 504 of the Rehabilitation Act of 1973 or section 1983 of the Civil Rights Act. Congress reacted by adding a provision for attorney fees to the Education of the Handicapped Act. (20 U.S.C. § 1415(e)(4)(B).)

In *N. M. Ass'n for Retarded Citizens* v. *State of N. M.* (D.N.M. 1980) 495 F.Supp. 391, a class action was brought against New Mexico and its local school districts based upon the alleged failure to provide a free appropriate public education to handicapped children. The plaintiffs' causes of action asserting constitutional violations were severed and stayed pending resolution of the federal statutory causes of action. (*Id.* at p. 393.) The district court concluded that the plaintiffs could not proceed with claims under the Education of the Handicapped Act because the state had not adopted that act and, without more, that was a governmental decision within the state's power. (*Id.* at p. 394.)[15] The court then considered the cause of action under section 504 and found that both the state and its local school districts were in violation of that section by failing to provide a free appropriate education to handicapped children within their territories. (495 F.Supp. at pp. 398-399.)

After the district court entered an injunctive order designed to compel compliance with section 504, the matter was appealed. (*N. M. Ass'n for Retarded Citizens* v. *State of N. M., supra,* 678 F.2d 847.) The court of appeals rejected the defendants' arguments that the plaintiffs were required to exhaust state administrative remedies before bringing their action and that the district court should have applied the doctrine of primary jurisdiction to defer ruling until the Office of Civil Rights could complete its investigation into the charges. (*Id.* at pp. 850-851.) The court also rejected the defendants' arguments that section 504 does not require them to take action to accommodate the needs of handicapped children and that proof of disparate treatment is essential to a violation of section 504. (678 F.2d at p. 854.) The court found sufficient evidence in the record to establish discrimination against handicapped children within the meaning of section 504. (678 F.2d at p. 854.) However, the reviewing court concluded that the district court had applied an erroneous standard in reaching its decision, and the matter was remanded for further proceedings. (*Id.* at p. 855.)

On July 19, 1984, during the proceedings before the Board of Control, a representative of the Department of Education testified that New Mexico has since implemented a program of special education under the Education of the Handicapped Act. We have no doubt that after the litigation we have just recounted New Mexico saw the handwriting on the wall and realized that it could either establish a program of special education with federal financial assistance under the Education of the Handicapped Act, or be compelled through litigation to accommodate the educational needs of handicapped

---

[15]The plaintiffs alleged that the failure of the state to apply for federal funds under the Education of the Handicapped Act was itself an act of discrimination. The district court did not express a view on that question, leaving it for resolution in connection with the constitutional causes of action. (*Ibid.*)

children without federal assistance and at the risk of losing other forms of federal financial aid. In any event, with the capitulation of New Mexico the Education of the Handicapped Act achieved the nationwide application intended by Congress. (20 U.S.C. § 1400(c).)

California's experience with special education in the time period leading up to the adoption of the Education of the Handicapped Act is examined as a case study in Kirp et al., *Legal Reform of Special Education: Empirical Studies and Procedural Proposals* (1974) 62 Cal.L.Rev. 40, at pages 96 through 115. As this study reflects, during this period the state and local school districts were struggling to create a program to accommodate adequately the educational needs of the handicapped. (*Id.* at pp. 97-110.) Individuals and organized groups, such as the California Association for the Retarded and the California Association for Neurologically Handicapped Children, were exerting pressure through political and other means at every level of the educational system. (*Ibid.*) Litigation was becoming so prevalent that the authors noted: "Fear of litigation over classification practices, prompted by the increasing number of lawsuits, is pervasive in California." (*Id.* at p. 106, fn. 295.)[16]

In the early 1970's the state Department of Education began working with local school officials and university experts to design a "California Master Plan for Special Education." (Kirp et al., *Legal Reform of Special Education: Empirical Studies and Procedural Proposals, supra,* 62 Cal.L.Rev. at p. 111.) In 1974 the Legislature enacted legislation to give the Superintendent of Public Instruction the authority to implement and administer a pilot program pursuant to a master plan adopted by State Board of Education in order to determine whether services under such a plan would better meet the needs of children with exceptional needs. (Stats. 1974, ch. 1532, § 1, p. 3441, enacting Ed. Code, § 7001.) In 1977 the Legislature acted to further implement the master plan. (Stats. 1977, ch. 1247, especially § 10, pp. 4236-4237, enacting Ed. Code, § 56301.) In 1980 the Legislature enacted urgency legislation revising our special education laws with the express intent of complying with the 1975 amendments to the Education of the Handicapped Act. (Stats. 1980, ch. 797, especially § 9, pp. 2411-2412, enacting Ed. Code, § 56000.)

As this history demonstrates, in determining whether to adopt the requirements of the Education of the Handicapped Act as amended in 1975, our

---

[16]Lawsuits primarily fell into three types: (1) Challenges to the adequacy or even lack of available programs and services to accommodate handicapped children. (*Id.* at p. 97, fns. 255, 257.) (2) Challenges to classification practices in general, such as an overtendency to classify minority or disadvantaged children as "retarded." (*Id.* at p. 98, fns. 259, 260.) (3) Challenges to individual classification decisions. (*Id.* at p. 106.) In the absence of administrative procedures for resolving classification disputes, dissatisfied parents were relegated to self-help remedies, such as pestering school authorities, or litigation. (*Ibid.*)

Legislature was faced with the following circumstances: (1) In the *Serrano* litigation, our Supreme Court had declared basic education to be a fundamental right and, without even considering special education in the equation, had found our educational system to be violative of equal protection principles. (2) Judicial decisions from other jurisdictions had established that handicapped children have an equal protection right to a free public education appropriate to their needs and due process rights with regard to placement decisions. (3) Congress had enacted section 504 of the Rehabilitation Act of 1973 to codify the equal protection rights of handicapped children in any school system that receives federal financial assistance and to threaten the state and local districts with the loss of all federal funds for failure to accommodate the needs of such children. (4) Parents and organized groups representing handicapped children were becoming increasingly litigious in their efforts to secure an appropriate education for handicapped children. (5) In enacting the 1975 amendments to the Education of the Handicapped Act, Congress did not intend to require state and local educational agencies to do anything more than the Constitution already required of them. The act was intended to provide a means by which educational agencies could fulfill their constitutional responsibilities and to provide substantial federal financial assistance for states that would agree to do so.

■■■ Under these circumstances we have no doubt that enactment of the 1975 amendments to the Education of the Handicapped Act constituted a federal mandate under the criteria set forth in *City of Sacramento* v. *State of California, supra,* 50 Cal.3d at page 76. The remaining question is whether the state's participation in the federal program was a matter of "true choice" or was "truly voluntary." The alternatives were to participate in the federal program and obtain federal financial assistance and the procedural protections accorded by the act, or to decline to participate and face a barrage of litigation with no real defense and ultimately be compelled to accommodate the educational needs of handicapped children in any event. We conclude that so far as the state is concerned the Education of the Handicapped Act constitutes a federal mandate.

## V. *Subvention for Special Education*

Our conclusion that the Education of the Handicapped Act is a federal mandate with respect to the state marks the starting point rather than the end of the consideration which will be required to resolve the Santa Barbara and Riverside test claims. In *City of Sacramento* v. *State of California, supra,* 50 Cal.3d at pages 66 through 70, the California Supreme Court concluded that the costs at issue in that case (unemployment insurance premiums) were not subject to state subvention because they were incidental to a law of general

application rather than a new governmental program or increased level of service under an existing program. The court addressed the federal mandate issue solely with respect to the question whether the costs were exempt from the local government's taxing and spending limitations. (*Id.* at pp. 70-71.) It observed that prior authorities had assumed that if a cost was federally mandated it could not be a state mandated cost subject to subvention, and said: "We here express no view on the question whether 'federal' and 'state' mandates are mutually exclusive for purposes of state subvention, but leave that issue for another day. . . ." (*Id.* at p. 71, fn. 16.) The test claims of Santa Barbara and Riverside present that question which we address here for the guidance of the Commission on remand.

■ The constitutional subvention provision and the statutory provisions which preceded it do not expressly say that the state is not required to provide a subvention for costs imposed by a federal mandate. Rather, that conclusion follows from the plain language of the subvention provisions themselves. The constitutional provision requires state subvention when "the Legislature or any State agency mandates a new program or higher level of service" on local agencies. (Cal. Const., art. XIII B, § 6.) Likewise, the earlier statutory provisions required subvention for new programs or higher levels of service mandated by legislative act or executive regulation. (See Rev. & Tax. Code, former §§ 2164.3 [Stats. 1972, ch. 1406, § 14.7, pp. 2962-2963], 2231 [Stats. 1973, ch. 358, § 3, pp. 783-784], 2207 [Stat. 1975, ch. 486, § 1.8, pp. 997-998], 2207.5 [Stats. 1977, ch. 1135, § 5, pp. 3646-3647].) When the federal government imposes costs on local agencies those costs are not mandated by the state and thus would not require a state subvention. Instead, such costs are exempt from local agencies' taxing and spending limitations. This should be true even though the state has adopted an implementing statute or regulation pursuant to the federal mandate so long as the state had no "true choice" in the manner of implementation of the federal mandate. (See *City of Sacramento* v. *State of California, supra,* 50 Cal.3d at p. 76.)

This reasoning would not hold true where the manner of implementation of the federal program was left to the true discretion of the state. A central purpose of the principle of state subvention is to prevent the state from shifting the cost of government from itself to local agencies. (*City of Sacramento* v. *State of California, supra,* 50 Cal.3d at p. 68.) Nothing in the statutory or constitutional subvention provisions would suggest that the state is free to shift state costs to local agencies without subvention merely because those costs were imposed upon the state by the federal government. In our view the determination whether certain costs were imposed upon a local agency by a federal mandate must focus upon the local agency which

is ultimately forced to bear the costs and how those costs came to be imposed upon that agency. If the state freely chose to impose the costs upon the local agency as a means of implementing a federal program then the costs are the result of a reimbursable state mandate regardless whether the costs were imposed upon the state by the federal government.

The Education of the Handicapped Act is a comprehensive measure designed to provide all handicapped children with basic educational opportunities. While the act includes certain substantive and procedural requirements which must be included in a state's plan for implementation of the act, it leaves primary responsibility for implementation to the state. (20 U.S.C. §§ 1412, 1413.) ▮▮▮ In short, even though the state had no real choice in deciding whether to comply with the federal act, the act did not necessarily require the state to impose all of the costs of implementation upon local school districts. To the extent the state implemented the act by freely choosing to impose new programs or higher levels of service upon local school districts, the costs of such programs or higher levels of service are state mandated and subject to subvention.

We can illustrate this point with a hypothetical situation. Subvention principles are intended to prevent the state from shifting the cost of state governmental services to local agencies and thus subvention is required where the state imposes the cost of such services upon local agencies even if the state continues to perform the services. (*Lucia Mar Unified School Dist. v. Honig, supra,* 44 Cal.3d at pp. 835-836.) The Education of the Handicapped Act requires the state to provide an impartial, state-level review of the administrative decisions of local or intermediate educational agencies. (20 U.S.C. § 1415(c), (d).) Obviously, the state could not shift the actual performance of these new administrative reviews to local districts, but it could attempt to shift the costs to local districts by requiring local districts to pay the expenses of reviews in which they are involved. An attempt to do so would trigger subvention requirements. In such a hypothetical case, the state could not avoid its subvention responsibility by pleading "federal mandate" because the federal statute does not require the state to impose the costs of such hearings upon local agencies. Thus, as far as the local agency is concerned, the burden is imposed by a state rather than a federal mandate.

In the administrative proceedings the Board of Control did not address the "federal mandate" question under the appropriate standard and with proper focus on local school districts. In its initial determination the board concluded that the Education of the Handicapped Act constituted a federal mandate and that the state-imposed costs on local school districts in excess of the federally imposed costs. However, the board did not consider the

extent of the state-mandated costs because it concluded that any appropriation by the state satisfied its obligation. On Riverside's petition for a writ of administrative mandate the superior court remanded to the Board of Control to consider whether the state appropriation was sufficient to reimburse local school districts fully for the state-mandated costs. On remand the board clearly applied the now-discredited criteria set forth in this court's decision in *City of Sacramento* v. *State of California, supra,* 156 Cal.App.3d 182, and concluded that the Education of the Handicapped Act is not a federal mandate at any level of government. Under these circumstances we agree with the trial court that the matter must be remanded to the Commission for consideration in light of the criteria set forth in the Supreme Court's *City of Sacramento* decision. We add that on remand the Commission must focus upon the costs incurred by local school districts and whether those costs were imposed *on local districts* by federal mandate or by the state's voluntary choice in its implementation of the federal program.

## VI. *Riverside's Objections*

In light of this discussion we may now consider Riverside's objections to the trial court's decision to remand the matter to the Commission for reconsideration.

Riverside asserts that the California Supreme Court opinion in *City of Sacramento* is not on point because the court did not address the federal mandate question with respect to state subvention principles. Riverside implies that the definition of a federal mandate may be different with respect to state subvention than with respect to taxing and spending limitations. As a general rule and unless the context clearly requires otherwise, we must assume that the meaning of a term or phrase is consistent throughout the entire act or constitutional article of which it is a part. (*Lungren* v. *Davis* (1991) 234 Cal.App.3d 806, 823 [285 Cal.Rptr. 777].) Subvention principles are part of a more comprehensive political scheme. The basic purpose of the scheme as a whole was to limit the taxing and spending powers of government. The taxing and spending powers of local agencies were to be "frozen" at existing levels with adjustments only for inflation and population growth. Since local agencies are subject to having costs imposed upon them by other governmental entities, the scheme provides relief in that event. If the costs are imposed by the federal government or the courts, then the costs are not included in the local government's taxing and spending limitations. If the costs are imposed by the state then the state must provide a subvention to reimburse the local agency. Nothing in this scheme suggests that the concept of a federal mandate should have different meanings depending upon whether one is considering subvention or taxing and spending limitations. Accordingly, we reject the claim that the criteria set forth in

the Supreme Court's *City of Sacramento* decision do not apply when subvention is the issue.

Riverside asserts that the trial court erred in concluding that the Board of Control did not consider the issues under the appropriate criteria and that the board did in fact consider the factors set forth in the Supreme Court's *City of Sacramento* decision. From our discussion above it is clear that we must reject these assertions. In its decision the board relied upon the "cooperative federalism" nature of the Education of the Handicapped Act without any consideration whether the act left the state any actual choice in the matter. In support of its conclusion the board relied upon the New Mexico litigation which we have also discussed. However, as we have pointed out, under the criteria set forth in the Supreme Court's *City of Sacramento* decision, the New Mexico litigation does not support the board's decision but in fact strongly supports a contrary result. We are satisfied that the trial court correctly concluded that the board did not apply the appropriate criteria in reaching its decision.

Riverside asserts that the Supreme Court's *City of Sacramento* decision elucidated and enforced prior law and thus no question of retroactivity arises. (See *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24, 37 [196 Cal.Rptr. 704, 672 P.2d 110].) We agree that in *City of Sacramento* the Supreme Court elucidated and enforced existing law. Under such circumstances the rule of retrospective operation controls. (*Ibid.* See also *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 953-954 [148 Cal.Rptr. 379, 582 P.2d 970]; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680-681 [312 P.2d 680].) Pursuant to that rule the trial court correctly applied the *City of Sacramento* decision to the litigation pending before it. As we have seen, that decision supports the trial court's determination to remand the matter to the Commission for reconsideration.

Riverside asserts that if further consideration under the criteria of the Supreme Court's *City of Sacramento* decision is necessary then the trial court should have, and this court must, engage in such consideration to reach a final conclusion on the question. To a limited extent we agree. In our previous discussion we have concluded that under the criteria set forth in *City of Sacramento*, the Education of the Handicapped Act constitutes a federal mandate as far as the state is concerned. We are satisfied that is the only conclusion which may be drawn and we so hold as a matter of law. However, that conclusion does not resolve the question whether new special education costs were imposed upon local school districts by federal mandate or by state choice in the implementation of the federal program. The issues were not addressed by the parties or the Board of Control in this light. The

Commission on State Mandates is the entity with the responsibility for considering the issues in the first instance and which has the expertise to do so. We agree with the trial court that it is appropriate to remand the matter to the Commission for reconsideration in light of the appropriate criteria which we have set forth in this appeal.

In view of the result we have reached we need not and do not consider whether it would be appropriate otherwise to fashion some judicial remedy to avoid the rule, based upon the separation of powers doctrine, that a court cannot compel the State Controller to make a disbursement in the absence of an appropriation. (See *Carmel Valley Fire Protection Dist.* v. *State of California*, *supra*, 190 Cal.App.3d at pp. 538-541.)

## DISPOSITION

The judgment is affirmed.

Davis, J., and Scotland, J., concurred.

The petition of plaintiff and respondent for review by the Supreme Court was denied April 1, 1993. Lucas, C. J., Kennard, J., and Arabian, J., were of the opinion that the petition should be granted.